Hehphill, C. J.
The argument of this cause has been characterized by signal ability throughout, and by extensive research on some ■of the points discussed; but others, from the want of proper authorities, were not sufficiently elucidated to relieve them from difficulty, or the court from much labor in their investigation.
The principal questions, as presented by the record, are:
1st. Whether a foreign colonist, who had under the colonization law of 1823 received a league of land as the head of a family from the government of Mexico, but who never at any time had a permanent domicile nor introduced his property in the country, and finally abandoned the same, is entitled to hold the lands so received by him under the laws of colonization.
*(482) 2d. Whether the ayuntamiento had lawful authority to investigate the conduct of colonists under the first contract of the empresario, Stephen P. Austin, relative to the performance of the conditions under which the title to the lands was holden; and whether on the facts as -ascertained by the ayuntamiento and the certificate of the empresario, the commissioner was justified in regarding the lands as vacant and issuing the title to the defendant.
3d. Whether the plaintiffs, under the plea of alienage, were disabled from maintaining the action.
From the proceedings of the ayuntamiento, it appears that Kinchen Holliman had never fixed his domicile in the country, and that all his property was in the state of Mississippi; and the fact of his abandonment of the country having been put in issue by the pleading and evidence, and the judge having charged the jury that if they believed he had abandoned the country they should find for the defendant, we may conclude that, in the opinion of the jury, the deceased intestate had, at the time of the grant to the defendant, domi-ciliated himself beyond the limits of the republic of Mexico.
In examining into the effects of this domiciliation abroad of the deceased, it will be unnecessary to advert to the doctrines and authorities advanced and adduced, in relation to the distinction between conditional and perfect titles, and the respective rights of the government and grantee, under titles of either description; at least so far as these rights are affected by the non-performance or otherwise of such conditions as payment of the price, cultivation of the lands, etc.
The title of Holliman was perfect so far as it could be impressed with that quality by the payment of the dues of the government and the cultivation of the lands. He was vested with a dominion over the property, as absolute as could be acquired by any foreign colonist or new settler, in the lands granted him under the laws of colonization. The price had been discharged before the title issued; and the fact of cultivation was expressly found by the ayuntamiento.
The consideration, then, of the authorities against his title, regarded as a mere permission to occupy lands until, on the performance of conditions, a more perfect grant should be issued, may be waived as inapplicable in a great degree to the real issues in the controversy. The true question is, did the domiciliation of the grantee, in a foreign country, as found by the ayuntamiento, operate as a forfeiture of the-titles to the land granted him under the laws of colonization?
In discussing this point let us for a moment advert to the doctrines on the subject of domicile, so far as they may be applicable in this case. The word domicile is defined in the El Diccionario de Legisla- *(483) cion to be-“ the place where one is established and resides with his wife, children and family, and the greater part of his movable property. The place where one resides only certain periods of time (algunas temporadas), according to circumstances as they occur, cannot be called his true domicile, although he may there have some real property,” p. 187. A well established rule on the subject is, that the domicile of origin must prevail until the party has not only acquired another, but has manifested and carried into execution an intention of abandoning his former, and taking another as his sole domicile. Somerville v. Somerville, 5 Ves. p. 787.
It is also a principle that the acquisition of a domicile does not simply depend on the residence of the party; the fact of residence must be accompanied by the intention of permanently residing in the new domicile and abandoning the former. The change of domicile must be manifested animo et facto, by the fact of residence and intention to abandon. De Bouneval v. De Bouneval, English Ecclesiastical Reports, 1 Curtis, 856; 2 Kent, 431.
The domicile of the grantee tested by these rules would be found in the country of this origin, the United States of the north. The ayuntamiento declare that he had no fixed domicile in this country; that all his property more than six years after the grant still continued in the state of Mississippi. He had, therefore, not abandoned the domicile of origin, and the circumstance of his making occasional visits to Texas would not be sufficient to invest him with a new domicile with all its duties, rights and privileges. His declarations abroad that he was a citizen of Mexico — and his refusal to exercise the privilege of voting, are important circumstances in favor of his claim to a domicile in Texas; but these are outweighed by the facts of residence in Texas being only occasional, and that, of the whole of his large property, none was removed from his original domicile in Mississippi. The introduction of his person and family, which in this case constituted his property, to the colony, was the principal consideration upon which the grant was founded, and constituted the evidence of the residence contemplated by the colonization law; and where this is wanting, no declaration of citizenship in Texas or refusal to exercise the privileges of voting in Mississippi (which could not have been denied him had he claimed its exercise) will supply the deficiency.
"Was the grantee, then, under the circumstances, entitled to hold the land derived to him as a colonist from the government of Mexico?
It will be conceded that the primary object of the laws of colonization was the introduction and establishment of settlers who would be *(484) come permanent residents of the country. The cultivation of the lands was an appropriate and essential means of sustaining the new community; but this, though a most important condition, was but subsidiary to the great end of expelling the savage and filling the wilderness with a Christian, civilized and laboring population.
To accomplish this paramount object, large bounties were offered out of the public domain —the enjoyment of which was accompanied with some restrictions, but the most important of which, and the most conducive to the accomplishment\of the purposes of the government, was the limitation which deprived the grantee of the property on the instant of his retirement from the country.
The mere culture of the land for a few years was, therefore, rendered insufficient without continued residence in the country, for the preservation of titles to land bestowed upon the colonists as a compensation, not for their removal alone, but for their permanent domiciliation on the soil. The settler had, it is true, after the performance of certain conditions, the power of alienating his lands-. But if he had not disposed of them in conformity with law, and whether the conditions were or were not discharged, and the residence was one or ten or more years, yet, on the instant of his abandonment of the country, his lands, ipso facto, were forfeited and reverted to the mass of public domain.
The great paramount object of the government being to have actual settlers on her lands, she was fully justified in limiting the duration of the estate to the period of the actual residence of the grantee; but whether the policy was wise, just or liberal or otherwise, it pervaded her colonization laws as an inflexible rule, and qualified the grants to settlers under those laws. It has been pursued to a certain extent under the new government, at least so far as it relates to the issuing of headright certificates; an applicant being compelled to prove not only residence at the declaration of independence, but up to the time of mailing application for the grant. In fact, the condition of remaining in the country ivas not cancelled, as were many others, by the 21st section of the land law of 183T.
That the necessity of continued domiciliation was imposed by law, and that abandonment annihilated alike all claims, whether derived from perfect or imperfect titles, will be obvious from an examination of some of the provisions of the laws of colonization.
The 29th article of the colonization law of 1823 declares that u every individual shall be free to leave the empire, and can alienate the lands over which he may have acquired the right of property, agreeably to the terms of this law, and he can likewise take away *(485) from the country all his property by paying the duties established by law.”
Article 15 of the national colonization law, August 18,1824, is expressed in the following terms, viz.:
“No person, who by virtue of this law acquires a title to lands, shall hold them if he is domiciliated out of the republic.”
The language of the article 30 of the colonization law of the state of Coahuila and Texas of the 24th March, 1825, is still more explicit, viz.:
“ New settlers who shall resolve to leave the state to establish themselves in a foreign country shall be at liberty to do so with all their property; but, after thus leaving, they shall no longer hold their land; and should they not have previously disposed of the same, or should not the alienation be in conformity with article 27, it shall become entirely vacant ” — “ quedara valdio enteramente.”
The terms of the • article 15 of the national, and 30 of the state colonization laws, are so perspicuous and precise, and their meaning so obvious, that it would be a waste of words to endeavor to illustrate their meaning by a critical analysis of the expressions employed, or by the application of rules of interpretation to prove that they prohibit the lands designated from being holden without domiciliation in the country. The language is altogether unequivocal, and where that is the case construction is not required to establish its meaning, for it is the first maxim in the exposition of treaties, laws, etc., that it is not allowable to interpret what has no need of interpretation. Vattel, p. 244.
The article 29 of the colonization law of 1823 is more obscure, yet from its spirit and terms, especially where taken in connection with the articles cited from the national and state colonization laws, the intention of the legislature was obviously to prevent any individual who had left the empire from holding the lands granted him by virtue of that law. The provision, if intended for any rational object, is by the strongest implication repugnant to any claim or pretension to hold after removal from the country.
The law authorizes the colonist to sell his lands on abandoning the empire,— an authority wholly superfluous, and a regulation altogether absurd and supererogatory if the expatriated individual or foreigner could retain his lands without residence in the country. The grant of power to sell his lands would be wholly useless if he, as a nonresident, could exercise full right and dominion over such property.
The want of an express declaration of forfeiture in the colonization law of 1823 of the lands of the colonist, on his passing under the *(486) allegiance of a foreign government, was doubtless regarded by tbe legislator as quite unnecessary.
The foreigner was granted lands for the purpose of augmenting the population of the country. These lands might be forfeited if his usefulness as a citizen was not demonstrated by their cultivation; if he abstracted himself and family from tbe sparse population, he so far diminished the capacity of the new settlement to repel the savage and sustain its existence amidst the perils of the wilderness; and thus thwarting the great ends of public policy, it would be strange indeed that as an absentee and subject of a foreign government, he should be permitted still to hold lands which had been granted as an inducement to his establishment and residence in the country.
The law might have prohibited alienations of lands in contemplation of abandonment of the country; and their giving permission for that purpose is evidence that they intended to confer a substantial right, and not a nugatory privilege.
By granting the right to sell before abandonment the inference is very strong that this was only one of the two alternatives, viz.: sale before leaving, or the reversion of the lands afterwards to the government. The subsequent legislation elucidates the intention of this law by neither forbidding nor expressly authorizing the alienation of lands on leaving the country, but declares that if they be not previously sold in conformity with law, they shall become entirely vacant.
The provision of the 29th article of the colonization law of 1823 is similar to the 5th article of the treaty between Great Britain and Spain in 1783.
This declares that the British inhabitants or others who may have been the subjects of the king of Great Britain in said countries, may retire in full security and liberty where they shall think proper, and may sell their estates and remove their effects as well as their persons without being restrained in their emigration on any pretense whatever, etc.
The term limited for their emigration was eighteen months. Under the construction of this article by the Spanish authorities, and by the order of the sovereign, British subjects had their election to remain as subjects of the king of Spain, taking the oath of allegiance without the power of going to other parts, not having the express license of the government, or to dispose of their property within the limitation. "Where they abandoned without alienation their lands were considered vacant and reverted to the government. 2 White, 301, 307; 1 Clarke’s Land Laws, 1026, 1033. By the treaty the British subject could preserve his property by remaining in the coun *(487) try and assuming the obligations of a subject of Spain. Under both the law and the treaty the owners of lands had the power of disposing of their property on retirement from the country. When this was not done under the treaty the lands were regarded as forfeited. The same privilege is accorded under the law, and there is no good reason why its non-user should not be followed by the same penalty.
In the one instance the power was given to those who might be regarded as foreigners; in the latter, the privilege is extended to citizens of the country.
This distinction can create no difference in the inference to be drawn from the provisions in both cases, viz.: that the grant of the special privilege of selling before departure excludes the idea of retaining the land after the retirement of the owner to foreign states or kingdoms. But waiving any further discussion of the treaty provision and all the influence which may be derived from its received construction, yet if this be regarded as a substantive1 provision, conveying any right and having a rational object; and especially when construed in conjunction with those of the national and state colonization laws on the same subject-matter, the purpose of the junta in inserting the provision cannot be mistaken, and is prohibitory of the holding of land granted under the law after the grantee leaves the empire.
The ayuntamiento do not in express terms find that he has abandoned the country, but they declare what is fully equivalent and is fatal to the rights of the grantee, viz.: that he never had in fact a domicile in the country; that all his property was in a foreign state; and the evidence on the trial proves abundantly the truth of the declarations of the ayuntamiento. It was shown that he had but occasionally visited the country; that his family consisted of a large body of slaves, and of these he never brought but one to Texas, which he afterwards sold. We concur with the ayuntamiento that the conduct of the grantee evinced a disposition to evade the laws and defeat the ends for which he was admitted as a colonist; and if he who after a residence of years and a discharge of all his duties is deprived of his lands on abandoning the country, much more should he who never had a permanent domicile in the country, nor removed his property or family thereto, be prohibited from holding lands granted to him on consideration of establishing himself with his family in the state.
"We have examined at some length the facts as found by the ayuntamiento, to determine whether they furnished in law any reasonable ground of justification of the declaration by that body that the land had been forfeited, or would become so if the colonist did not *(488) within six months remove himself with his property to the colony. This examination would have been unnecessary if the action of the ayuntamiento had been clearly within their jurisdiction; but as this has been contested and their powers have not been satisfactorily or fully explained, we deemed it expedient to examine the grounds upon which their action was founded.
No witnesses were examined or evidence adduced as to the practice of the former authorities of the country in regranting lands which had been forfeited — none as to the powers customarily exercised by the ayuntamientos in relation to original or regrants of land. No titles of regrants were produced from which the usages in relation thereto, as well as the authorities by whom they were made, might bea ascertained.
The proceedings of this and other ayuntamientos on the revocation and regrants of titles were not in the evidence, nor was the official letter of the empresario, which induced the investigation of all the titles issued in his first colony, read at the trial or sent up with the record. The decrees, No. 37, defining the powers and duties of ayun-tamientos, and No. 100, on the municipal ordinances of the ayunta-miento of Austin, have not been published; nor were they addnced in argument, nor are they now accessible to the courts. We proceed, therefore, to the investigation of the powers of that body under so many disadvantages that we cannot repose full confidence in any conclusions we may attain on the subject.
The ayuntamientos had under their charge, by the general laws and by the special laws regulating the action of each particular ayunta-miento, the police and good government of the towns or municipalities nnder their jurisdiction; the health and security of the inhabitants and of the public tranquillity; in fact of all matters pertaining properly to the political and financial government of the said towns and municipalities. 4 Sala, p. 138; Diccionario, p. 55. The ayuntamientos, though anciently possessing some judicial power, were at the time of their action on this title mere political authorities.
The first chapter of the law of the Cortez, June 23, 1813, Collen de los Decretos, p. 86, treats of the obligations and functions of the ayuntamientos, and in none of its sections does it invest that body with power over the grants of lands, but in its last section the ayun-tamientos are charged, in addition to their other obligations, with all other subjects entrusted to them by laws, regulations or municipal ordinances.
Had the ayuntamiento, then, by any law the authority to take cognizance of the titles to the colonists under Austin’s first grant for *(489) the purpose of annulling them and regranting tbe lands to others? By the fourth article of the colonization law of 1823 it is provided: “Families who emigrate, not included in a contract, shall immediately present themselves to the ayuntamiento of the place where they wish to settle, in order that this body, in conformity with instructions of the executive, may designate the lands corresponding to them, agreeably to them may establish.”
The 23d article of the same law, and upon which the ayuntamiento-in their action on this title doubtless relied as the principal foundation of their authorities, is expressed in the following terms:
“If after two years from the date of the concession the colonist should not have cultivated his land, the right of property shall be considered as renounced, in which case the respective ayuntamiento can grant it to (mother.”
From these articles there can be no doubt that extensive authority was vested in the ayuntamientos in issuing, revoking and regranting titles to lands under the colonization law of 1823. In the colonization law of the 24th of March, 1825, of the state of Coahuila and Texas, the foreigner who had already arrived was in its third article directed, if he wished to settle in the state, to make a declaration to that effect before the ayuntamiento of the place selected as his residence, etc.
By article 4, the said foreigner, from the time he is domiciliated in conformity with the above article, can designate any vacant land, and the respective political authority shall grant it .to him in the.same manner as to a native of the country in conformity with existing laws on the subject, under the condition that the proceedings shall be passed to the government for its approbation. Can the “ respective political authority” designated in the 4th article be any other than the political authority of the place or municipality selected by the foreigner as his residence? And if there be no higher or other political authority in the municipality than the ayuntamiento, must not that body necessarily be vested with the powers granted in this article?
In the colonization law of 1823 the respective ayuntamientos of the place had the same power of designating lands to the foreigner, in conformity with instructions from the executive, that is given by the state to the “respective political authority;” and it certainly is in consonance with the rules of legitimate construction to consider these general terms as descriptive of the ayuntamientos, especially in municipalities where they are the only or the principal present political authority. In jurisdictions where there is a higher political authority, such as the political chief or governor, the application for lands *(490) should doubtless be made to them; and the action of the ayunta-miento, if any, would be taken at the direction of a higher officer.
In the 26th article of the state colonization law it is declared “ that the new settlers, who, within six years from the date of their possession, have not cultivated or occupied the land granted them according to its quality, shall be considered to have renounced them, and the respective political authority shall immediately proceed to take possession of them and the titles.”
The term, respectivepolitical authority, again recurs in this article; and as by the colonization law of 1823, the respective ayuntamiento of the place had, under the same circumstances of non-cultivation, the power of revoking the title and regranting the lands, we see no reason why the ayuntamiento should not be regarded as the authority contemplated by the state law, especially in municipalities where there exists no higher political authority.
By decree No. 272, p. 247, laws of Coahuila and Texas, in article 35 the ayuntamiento under certain circumstances is empowered to make titles to colonists, of which that body shall inform the executive through the ordinary channel.
These provisions, from various laws relative to colonization, abundantly prove that the ayuntamientos had extensive authority in relation to the granting and revocation of titles issued or revocable under the provisions of those laws. The exact limits of the jurisdiction of those bodies over such subjects have not been sufficiently explored to enable us to determine with certainty whether their act in relation to Holliman’s title was properly within the scope of their authority. There can be no doubt of their legitimate power to revoke a title for the want of cultivation and abandonment, as they did in several instances of the same proceeding. The articles of the colonization law before referred to show that the power of annulling and granting titles was entrusted to political and not judicial authorities — to the ^ayuntamientos in one of the laws, expressly; and in the other, by strong implication.
The objection against their action, as being the exercise of judicial power, is therefore without foundation. The political .authority had power to investigate the conduct of the colonist, and ascertain whether he had complied witli the conditions of his concession and of the colonization laws. The presumption of law that the public act of the public officer, purporting to be exercised in an official capacity and by public authority, shall be presumed to be the exercise of a legitimate and not an usurped authority, is recognized in its full force. 6 Pet. 72, 78.
*(491) But sucb presumptions are inadmissible - where the jurisdiction of the officer is defined by the well-ascertained laws of the land, or by the proof, to the contrary, of usages and customs which have acquired the force of law. This presumption will not, in this case, be adduced in support of the action of the ayuntamiento, but a strong one arises in favor of their authority from the long acquiescence of all the parties whose titles were annulled or affected by the proceedings of the ayuntamiento.
That redress could have been obtained under the former govern- j ment, against the illegal and unwarrantable proceedings of the inferior authorities, cannot be doubted. Why this was not attempted has been left wholly unexplained; and raises the presumption that at the time, and for years afterwards, the action of the ayuntamiento, when the laws on the subject were better understood, was considered to be in the exercise of a legitimate authority; or that if only accessorial to some higher jurisdiction, the grounds upon which it acted were such as to have secured the ratification of the higher authorities.
The grant to the defendant, if made without authority, is void. 6 Pet. 298; 9 Cranch; 5 Wheat. 303. But we are not as yet sufficiently informed of the power of the ayuntamiento to determine against the jurisdiction which they, in this instance, assumed to exercise.
But waiving for the present further discussion of the action of the ayuntamiento, we are not of opinion that in this class of cases, regarded as an abandonment of the country, or as equivalent thereto, that there was any necessity for an express revocation of title by any .authority, political or judicial, to enable the commissioner to regrant tlie land to a resident colonist. It was the duty of the commissioner to have ascertained through some proper source of information whether the land had been abandoned by removal of the proprietor to a foreign country, without disposing of the same in conformity with law; and having satisfied himself of the fact, he was authorized by law to regard the land as “ entirely vacant,” and regrant the same to another. The law having declared the land “entirely vacant ” on the contingency of abandonment, and no mode for ascertaining the fact having been pointed out, the commissioner, the granting authoi’ity in a colony, was necessarily compelled to exercise some discretion in the adoption of what should be'deemed by him the most appropriate modes of obtaining the requisite information. It is believed that applications for lands denounced a-s vacant by the abandonment of the former proprietor were usually referred to the alcalde, with the request to make the necessary investigations to ascertain the truth of the facts as stated by the petitioner, and the commissioner acted on *(492) the return made by that officer. Here the facts were found by the ayuntamiento, and perhaps also by the alcalde, at least so far as related to his continued absence from the country. There is no evidence that the commissioner did not adopt all the customary measures for obtaining information, preliminary to the execution of the grant to the defendant.
There being no proof in the record as to the usages under the former government of Texas, in relation to the regrants of abandoned lands, we may with propriety refer to the usages in analogous cases in other countries under the jurisdiction of Spain.
The report of the commissioners on the claims to lands of British subjects in Plorida, forfeited by abandonment, under the provisions of the treaty of 1783, does not distinctly state the mode of procedure adopted in the regrants of these lands. 1 Clarke’s Land Law, p. 964; 2 White, p. 296. But the surveyor general of the province of Plor-ida, Mr. Clarke, who must have been well informed on the subject, states distinctly that the evidence of the forfeiture was the regranting of the land to another person, and that he knew of no other mode of declaring them forfeited. 1 Clarke’s Land Law, p. 1023.
In White v. Wells, 5 Mart. 622, forfeited lands were regranted without any previous proceedings to ascertain the forfeiture. Vide Boisser and others v. Mataer, 5 Mart. 678; Flietas and others v. Mayor and Aldermen of New Orleans, N. S. 430; Buyck and others v. United States, 12 Pet. 215.
The fact of the frequent regrants of forfeited lands is beyond doubt.
In the report of the assistant counsel of the United States, B. If. Call, on the land claims in Missouri, he states as a fact that in all the states and territories ever under the dominion of Spain, there are numerous cases where the land now held by perfect titles had been previously conceded to some other persons on conditions, for the non-performance of which the land was forfeited. Ex. Documents, 1st session 24th Congress, vol. 7, p. 20.
In countries governed by the common law, it is laid down as a rule, that in all forfeitures accruing at common law nothing vests in the government until some step shall be taken for the assertion of its right, but when the forfeiture is given by statute, the thing forfeited may either vest immediately, or upon the performance of some particular act, as shall be the will of the legislature. U. S. v. Grundy & Thornburg, 1 Cond. 554.
This doctrine of the immediate reverter to the public domain of lands forfeited under the provisions of a' statute has been applied by *(493) the courts of Alabama in several cases of forfeiture of reservations of lands under treaties with the Creek and Cherokee tribes of Indians. The first article of the treaty with the Creek Indians in 1814 provides “that every friendly chief or warrior who have possessions within the territory ceded to the United States shall be entitled to a reservation of one mile square of land, which should inure to the said chief or uoa/rrior and his descendants, as he or they shall continue to occupy the same/ but upon the voluntary abandonment thereof by such possessor or his descendants, the right of occupancy or possession of said lands shall devolve to the United States, and shall be identified with the right ceded hereby.”
In the treaty with the Olierokees in 1817, there was a reservation of land to each head of a Cherokee family, in which they will have a life estate, with a fee simple to their children, reserving to the widow her dower, etc.; provided, that if any of the heads of families for whom reservations may be made shall remove therefrom, then and in that case the right to revert to the United States. Where the Indians removed from these reservations, it was holden that they reverted immediately to the United States; that legal proceeding or entry was unnecessary to conclude the title in the United States, as it vested immediately on the voluntary cesser of occupation.
And the doctrines were laid down, “ that where an estate was conveyed by the deed of an individual or corporation, subject to be defeated by the breach of a condition subsequent, if the condition be broken, it is necessary that the grantor or person authorized to take the advantage of it should either enter or do some other act equally effectual in order to divest the estate; but if the estate is granted by a legislative act, subject to forfeiture by the happening of some future event, if the event occurs, no act is necessary to revest the estate in the government. It reverts immediately on the happening of the contingency.” Kennedy & Moreland v. McCartneus’ Heirs, 4 Port. 141; Cromnelin v. Minter et al. 9 Ala. (N. S.) p. 594; University of Ala. v. Uniston, 5 Stew. & Port. 17; Gill v. Taylor, 3 Port. 182; Rogers v. Rawlings et al. 8 id. 825. As to forfeitures under a statute, 3 Cranch, 349, 351; 8 id. 405, 408, 409; 11 Johns. 331-2; 14 id. 128; 2 D. & E. 65.
The estate in the Indian was regarded as a qualified inheritable fee, subject to be defeated by the collateral circumstances of cesser of occupation and abandonment of the premises; and that on the determination of the estate of the reservee, the land became a part of the public domain. See also 4 Kent, 8, 129. 2 Bl. 124, on the subject of collateral limitations.
*(494) The only distinction between the estate of the colonist under the laws of Mexico, or the state of Coahuila and Texas, and of the reser-vee, is that the former, after the performance of certain conditions, had the power of alienating the land; but they both held with the limitation and condition that their titles on abandonment, one of the premises, the other of the country, should become null and void, and that their lands should revert to the grantor, and become a part of the public domain.
'The language of the law of colonization is, that the new settler after leaving for a foreign country shall no longer hold his land, and if not previously disposed of in conformity with law, it shall become entirely vacant. The terms are more emphatic than those employed in the treaties, and convey unequivocally to the mind the intention of the law-giver, that on the happening of the contingency, the land should instantaneously, and without intermediate proceedings, be reincorporated with the public domain. To say that the land is entirely vacant, and yet does not belong to the public domain, is a contradiction in terms repugnant and irreconcilable.
The expressions are singularly explicit, and show that the residence of the grantee in the country (the great object of the government in making the grant) being defeated by his removal to a foreign country, his estate at once becomes null and void, and vests immediately in the grantor. Other provisions of the colonization laws require action of the authorities where the condition of cultivation is not performed, in revoking the former before a new title is granted. But, on abandonment, the law has not directed any authority to investigate and determine the forfeiture, but has declared the estate wholly determined and the laud “ entirely vacant.” The government of the United States could derive no advantage from the continued occupation of the lands by the Indian reservee; but, on the naked terms of the law, it was determined that the reservation, on the oesser of occupation, reverted at once to the public domain. Here the purpose of the government, in the whole of her land policy, was to have settlers on the soil or residents in the country; and the terms of law also being wholly unequivocal, there can be no hesitation in determining a point according to the doctrines in the cases cited, and declaring in the language of the law itself, that lands abandoned by removal abroad “ become entirely vacant.”
I have discussed this point on the terms of the 30th section of the colonization law as they are rendered by the public translator of the laws of Coahuila and Texas. I will now proceed to show that they are capable of a different version, and which will still more clearly *(495) demonstrate the utter annihilation, by abandonment, of all rights to lands granted under the laws of colonization.
In the ease of the United States v. Arredondo, 6 Pet. 691, an important distinction was held to arise out of a supposed difference in the meaning of the terms employed in the American, from those in the Spanish version, in the 8th article of the treaty of 1819. The words in the Spanish were todas las concessiones de terrenos hechas, etc., quedaran ratificadas y reconocidas, etc.
The American version was, “ all the grants of lands made,” etc.* 11 shall be ratified and confirmed,” etc. The court held that the true meaning of the Spanish terms was not conveyed by those employed in the English version. That two dictionaries had been consulted, and two translations had been made by competent judges of the Spanish language, and that the true signification of the Spanish version was, “ that the grants, etc., shall remain confirmed.” That quedaran in Spanish means shall remain. That the difference was important; that under the terms “ shall remain confirmed, ” the grants were already confirmed, and the United States could assert no claim to the lands; but that under tlip terms “ shall be confirmed,” there must be a law ratifying them or authorizing suit to be brought, etc. Now the language in the colonization law is similar to that employed in the Spanish version of the 8th article of the treaty.
The terms in a portion of the 30th article of the law are,q>ero verificada dicha salida, no conservara mas su terreno, y etc., qtiedara valdio enteramente. Giving the verb quedara the signification attributed to it by the supreme court of the United States, the translation should be, “ but after thus leaving he shall not any longer hold his land, ándete.; it shall remain entirely vacant.” The terms shall remain entirely vacant import still more emphatically than do the terms “ shall become entirely vacant,” the immediate reverter of the land to the mass of the public domain.
They shall not be made vacant or even become so; but they are entirely vacant and shall so. remain. They have returned cortipletely,; absolutely and entirely to the mass of public lands and cannot be severed therefrom but by regrant from the sovereign power of the state.
The expression in the constitution of the republic “ that no alien shall hold land in Texas” is strong; but its prohibitory energy would have been greatly invigorated by the addition of the following terms: “ and all lands acquired by an alien shall remain entirely vacant.” Could there be a difference of opinion as to the true construction of such a provision; and would there be any more necessity of an inquest of *(496) office, than when under the common law, lands descend to an alien or the lands of an alien, on his death, vest without office found immediately in the state? 2 Kent, 54; 1 Bac. tit. Alien C. p. 133; 2 Dand, S. C. p. 111. How lands entirely vacant can be rightfully claimed by a private individual is totally incomprehensible.
Let us suppose that the terms had been “ the titles to the lands shall remain entirely anmdledP ' "Would there have been any necessity of formal proceedings for their avoidance? The terms employed are precisely equivalent, and with the same destructive power operate the utter extinguishment of all private right, title or claim to such lands.
The terms that the lands shall remain entirely vacant are employed by the grantor, and according to the doctrines in Arredondo’s case, 6 Pet. p. 741, we^ must be governed by the clearly-expressed and manifest intention of the grantor and not the grantee in private, a fortiori, in public grants; and this is a rule too clear to be mistaken and too positive to be disregarded.
By the confiscating acts of Maryland, 1780, c. 45 and 49, the property of British subjects was confiscated without office-found, entry or other act done; and though such property was not discovered until long after the treaty of peace, by the first of these acts it was declared that “ all property within this state, debts only excepted, belonging to British subjects, shall be seized and is hereby confiscated to the use of the state;” by the second, passed during the same session, commissioners were appointed for the purpose of 11 preserving all British property seized and confiscated by the act of the present session, to seize, confiscate and appropriate all British property within this state; and that the said commissioners shall be and are hereby declared to be, in the full and actual seizin and possession of all British property seized and confiscated by the said act without any office-found, entry or other act to be done.” Twenty years afterwards and after the treaty of peace, which, in its sixth article prohibited future confiscations, iiiformation was given to the agent of the state, that certain lands were held by a British subject. The case was finally decided in the supreme court of the Hnited States; and it was there contended that this property having been holden by the British owner for sixteen or seventeen years after the treaty of peace, its seizure now would be one of those future confiscations inhibited by the treaty — that the sovereign gained no title till actual seizure — that the writ of seizure was a necessary consequence of office-found (2 Inst. 206, 207, 573, 689); that, until entry or seizure there was only a possibility of an estate which was to be gained by entry — that seizure or entry was *(497) the commencement o? title. Co. Litt. 118, a.; 12 Mod. 92, Roberts v. "Witherhead. But by the com't it was held, that the law itself completely divested the whole estate of the former owner and vested it in the state — that the cestui qui trust (the state), though not in possession of‘the property, was nevertheless the owner of it, and it the property or thing itself had come into the actual possession of the commissioners (the trustees) not a scintilla of interest remained for an instant afterwards, in the former owners — that no act of the commissioners was necessary in order to obtain seizure in the land. No seizure was necessary— the second law considered that all property belonging to British subjects was by the mere operation of the first law seized and confiscated, and declares that the commissioners were then in the full and actual seizin and possession of the property so seized and confiscated by the first law, though no entry or other act had or should be made or done, and that the commissioners, by virtue of the law, were in actual seizin of the land.
Is there more immediate divesting energy embodied in the terms of these acts, than in those of the laws of colonization?
The former declare that the state, through her commissioners, is in the actual seizin, and possession of the property without any office-found, entry or other act to be done; the latter, that the lands shall remain entirely vacant, or in other words, entirely and exclusively public property. The former by their own mere force, extinguished every scintilla of interest in the former owner — is it not also utterly expunged by the latter?
In the one case the land was, by the mere operation of the law, vested in the state through her commissioners; in the other, it is vested immediately in herself, and is held with the ex elusive right and absolute dominion possessed in and over all ber oilier lands “ entirely vacant.” By the former, actual seizin of the confiscated property was conferred without entry or office-found, and this done rightfully.- and in the exercise of the legitimate powers of sovereignty. Is not.-, by the latter the state actually and legitimately seized of abandoned, lands without inquest, entry or other act, done or to be done;, and this, from the operation of laws based on tbe rightful exercise -of” the legitimate powers of sovereignty? Bor none will venture to irm-pugn the rightful authority of Mexico, or of Coabuila and Texas, to* declare in tbeir laws authorizing grants of land, that those-lands-should, on a certain contingency, revest in tlie state without entry or other act done; or in other words, that they should become entirely-vacant; and if they bad this authority on the grant of lands, their right, on the happening of the contingency, to bold, and,regard.,these *(498) lands as vacant is indisputable and too clear to admit of a shade of doubt or hesitation. Smith v. The State of Maryland, 6 Cranch, 286; 2 Har. & J. 471; id. 112; id. 101; U. S. Dig. 541.
" This case is decided on all its circninstances. The occasional or periodical visits of a domiciliated colonist to a foreign country would not be regarded as an abandonment; but while the original domicile continues unchanged occasional or periodical visits to Texas could not confer on the sojourner the status of a resident citizen, as required by the laws of colonization.
In this case the .interests of third parties are not involved. All the transactions, the grant, revocation and regrant occurred under former governments of the country; and while usurpations of power would be disregarded and flagrant violations of law redressed, yet we will not, with a hypercritical spirit, revise matters determined by former authorities or disturb rights founded upon their action or adjudications.
Let us now proceed to examine whether the alienage of the plaintiffs disables them from maintaining the action.
This is to be decided, not by the rules of the common law or of the laws of nations, but by the jurisprudence of Spain and Mexico; and in tbe investigation, we have received no aid from counsel to whom the authorities and laws were not accessible; and the examination made for the first time at this term has been under such adverse circumstances that its results on some of the points are not altogether satisfactory.
It appears that by the laws of Spain a foreigner could not hold real property without becoming a resident citizen, at least where lands were acquired by purchase.
The first law on the subject brought to my notice is, Eecopilacion Novissima, 1. 6, tit. 5, book 3, in which it is declared that no donation or sale made by the king of any cities, villages, places or other inheritances, or of criminal justice or of civil jurisdiction, shall be valid, and that no subject shall make donation or sale of any thing of tbe like kind to a foreigner, under pain'of losing the same and of punishment at the pleasure of tbe sovereign.
The next law of the same title and book is more explicit, and declares that we will not give, nor allow to be given, to any foreigner whatever, any cities, towns, castles, places, lands, inheritances or islands belonging to our kingdoms or to our royal crown, and so we pledge our true faith and royal word; and we forbid all and every of our natural-born subjects to give, sell or exchange any towns, places, castles, lands, inheritances or islands of our kingdoms to any foreign *(499) Mng, lord or other person (persona estrangera de fuera de Nuestros Meijnos), on pain of being dealt with according to our pleasure.
The prohibition of the alienation of lands to foreigners out of the kingdom, as expressed in these laws, is positive and unequivocal.
It may be said, however, that these forbidden alienations were of property of a feudal nature that had rights and franchises attached thereto which a foreigner could not legitimately exercise. This construction was adopted by the supreme court of Louisiana in the case of Eaguet v. Phillips, 5 Mart. 652, and has also by the Spanish commentators Institutes of Asso y Manuel, p. 22; 1 White, p. 26; but the terms of the law embrace all landed property and exclude foreigners without the kingdom from acquiring the same by gift, sale or exchange.
These laws do not positively declare a sale, gift, etc., made by a subject to a foreigner void, but this is the legal consequence of the violation of the law. It has been contended, that the laws but attached a penalty to the sale, the amount of which was afterwards fixed by Eecopilacion Novissima, 1. 12, tit. 5, book 1.
This law is found in this compilation, collated with others which relate to the “ property of the church,” and ordains that whoever shall give, sell, or in any other manner or by any title whatever, transfer any inheritance or other real property to any university, college or person not belonging to our royal jurisdiction nor subject to it, shall be held to pay us the fifth part of the true value of such property over and above the ordinary alcabala, and declares the said lands tributary for the said fifth part. The object of this law was to restrict the sale of lands to foreign universities or colleges, and cannot be said to be a subsequent construction of the laws before cited, as it was ordained three years before the first and several years before the last of these laws.
This law was ordained in 1452; whereas, the first was in 1455 and the second in the reign of Ferdinand and Isabella, which did not commence until years afterwards.
It is true, however, that the laws of Spain permit foreigners to acquire real property in the kingdom, but it is on the condition of naturalization or residence.
Under the title XI, book 6, of the Eecopilacion Novissima, are collated the laws in relation to both transient and domiciliated foreigners. The first law, 1623, invites foreign Catholics friendly to the crown and treats of them subsequently throughout as residents of the kingdom, and requires the proper authorities of the villages where they are established to accommodate them, as far as possible, with houses and lands suitable to their occupation.
*(500) The next law, 1703, commands all Englishmen and Hollanders who are not Catholics to leave the kingdom, and Catholics also, if not possessed of the qualifications prescribed by the royal decree, 1701, which permitted the Catholics of England, Ireland and Holland, who had been ten years in the kingdom and were married with Spanish women, to live in the said kingdom, to trade and traffic freely and to hold real and other property, etc. In the next law of the same title and book, law 3, 1716, are detailed the various circumstances under which foreigners may be considered as residents of the kingdom. As, for instance, he who has obtained the privilege of naturalization, etc.; he who is married with a native woman of these kingdoms and remains domiciliated in them, or a foreign woman who shall marry with a native husband by that fact itself enjoys the rights and domicile of her husband, and also (el que se arraygar eompranda y ad-quiriendo biennes raíces y possessiones), he who establishes or fixes his residence, purchasing and acquiring real property. The verb, arraygar, means “ to root, to fix the root,” and when used reflectively, as it is here, signifies most emphatically the permanent fixture in a place of one’s residence or habitation.
The acquisition of real property having impressed the foreigner with, the quality of domiciliation, his duties as a resident are pointed out in law 8, same title and book (1791). This law treats of the formalities of the registers of foreigners resident in the kingdom with the distinction between the transient and the domiciliated.
The foreigners who are domiciliated are required to be Catholics, to take an oath of fidelity to that religion and to the sovereign, renouncing all their privileges as foreigners and all relation to, connection with and dependence upon the country of their origin, and agreeing not to use its protection, nor that of its embassadors, ministers or consuls; and all this to be done under penalty of the galleys, garrison or absolute expulsion from the kingdom and confiscation of property.
So that it seems wholly immaterial, whether bv residence in the kingdom, a foreigner is authorized to purchase real property or whether such acquisition confers on him the status of domiciliation; for in either event, he acquires a qualified naturalization and is subjected to its duties and obligations. I have no doubt, however, that residence in the country is the substratum upon which the privilege of holding real property is accorded. In 1. 2, tit. 24, Partidas, 4, one of the modes of acquiring naturalization is declared to be a residence of ten years in the country.
It is said, however, that whatever might be the restrictions on foreigners holding real property in Spain, yet they were permitted by *(501) law to bold such property in the Indies, and in support of the position reference is made to the 31st and 32d laws of tit. 27th, 9th Book of the Recopilación, de las leyes de las Indias.
There are thirty seven laws under this title, most of which are prohibitory or greatly restrictive of the admission of foreigners into the colonies of Spain, and by none of them is their introduction expressly permitted, without special license for that purpose. But although, by law foreigners were prohibited, under severe penalties, from passing to or trading in the Indies, yet these prohibitions were not at all times strictly enforced, and for the purpose of augmenting the population, a species of fictitious naturalization was conferred upon foreigners who possessed certain qualification and had resided in the country for a certain time. Memorias, Históricas, sobre la Legisla-ción, etc., por Antunez, p. 291.
In law X, same title and book, it is declared that the expulsion of foreigners from the Indies shall not extend to mechanics who can be of service to the commonwealth. There are other cases also in reflation to composition with foreigners who had passed into the Indies.
But to return to laws 31 and 32.
The first provides, in substance, that a foreigner to become naturalized for the purpose of trading to the Indies and Western Islands, must have lived in Spain or in the Indies for twenty years, and ten of them having a home and real property, and be married with a native, or daughter of a foreigner born in the kingdom or in the Indies.
By the 32d law the amount of real property'to be possessed is fixed at four thousand ducats, and must be acquired by way of inheritance, donation, purchase or onerous title.
These laws afford no countenance to the proposition that a foreigner out of the kingdom can hold real property in the Indies. Domiciliated foreigners are alone embraced, and we have already seen that thev must assume the obligations of subjects. Ten-year residence will also give the foreigner a species of naturalization, and he might have acquired the \\h >le of the real property after the expiration of the term of probation; but whether purchased before or after the ten years, the property could not be acquired without domiciliation and its consequent duties and obligations.
If aliens could hold real property in the Indies without residence and the oath of allegiance, the subjects of Great Britain in Florida, after the treaty of 1783, would doubtless have been permitted to retain their possessions. But on the contrary, their lands were forfeited without residence and the oath of allegience.
Governor White, in his regulations, 1S03, vol. Land Laws, n 1001, *(502) declares, “ that whenever new settlers taire the customary oath of allegience,” etc., treating the oath as one of the usual and necessary prerequisites in obtaining a grant of land.
It is, however, contended that though a foreigner may be incapable of acquiring lands in Spain by purchase, donation, etc., yet, he may take and hold them by inheritance.
It would seem paradoxical that a foreigner could not acquire and hold real property by gift, purchase, etc., without domiciliation and the oath of allegience, and yet, by inheritance he could hold without either.
The general rule recognized by commentators on the laws of nations, as to who are to be regarded as the heirs of a foreigner, is, that he slill continues a citizen of his own country and a member of his own nation, the property he leaves at his death in a foreign country ought naturally to devolve to those who are his heirs, according to the laws of the state of which he is a member. But, notwithstanding this general rule, his movable effects are to be disposed of according to the laws of the country where they are situated. 2 Yattel, cap. 8.
This rule pervades the jurisprudence of Spain, and it is laid down in Febrero, vol. 1, p. 562, that a domiciliated foreigner who has property in the kingdom and in his own country must dispose of the former according to the laws of the kingdom, and of the latter according to the laws of his own country, and not of the whole in the same manner, because a law or statute does not extend its effects beyond the limits to which the power of the legislature extends, and consequently does not embrace property situate without the territory.
The subject of wills by foreigners is treated of at some length in the same volume of the same author, at page 827 and in the notes to paragraph 31.
The question, whether aliens can hold real property in Spain or her colonies by inheritance, is not free from perplexities, and from the want of authorities and opportunity for investigation I have not attained a satisfactory or positive conclusion on the subject. In the case of Phillips v. Rogers and others, 5 Mart. 700, it was decided after full argument and examination of the authorities, that nothing in the laws of Spain or of her colonies precluded aliens from inheriting i’eal estate.
This decision of a most learned court, especially qualified to determine questions growing out of the laws of Spain, is entitled to great weight and authority. But while regarding it with all due respect, I cannot say that I am satisfied of its correctness without restrictions and qualifications.
*(503) I will glance hastily over such of the provisions of law, referred to in the opinion of the court, as I have been able to trace, for they are generally misquoted.
It is true that the laws under tit. 3, Partidas, 6, in enumerating those incapable of inheriting, do not include aliens among the number; and in the second law it is declared that any one may be instituted as heir who is not prohibited from being such by the laws of this book.
Foreigners, also, are not prohibited from making wills, but as has been already shown, they must, in Spain, dispose of their real property according to the laws of the kingdom and not otherwise. See the references in Febrero.
The question does not rest upon the power of a foreigner to make a will. That is conceded; but upon the capacity of aliens without the kingdom to inherit real property under the laws of Spain.
The law upon which the principle reliance is placed in support of the capacity of the plaintiffs in this action is found in 4 Partidas, tit. 24,1. 2.
This law prescribes the various modes of obtaining (naturaleza) naturalization. These are stated in very brief terms, and several of them, according to the commentaries of Lopez, must be understood with modifications.
The sixth mode of obtaining naturalization is (for heredamiento) by inheritance.
These terms without explanation would admit all foreigners to the rights of citizenship by the mere fact of there being an inheritance to which they would, if subjects, have been entitled without residence or the acknowledgment of allegiance; and this although the ancestor on the acquisition of real property was invested with the character and obligations of a subject. This is too absurd to be admitted, unless upon full examination of the laws and authorities its correctness be placed beyond equivocation or doubt.
The intention of the lawgiver cannot be understood from the brief terms in which it is expressed, without consulting other laws and commentators on the subject. Lopez, in his comments on the terms, for heredemiento, refers to various laws and glossaries which are inaccessible to this court, and adds that this (naturalization by inheritance) arises only when he (the heir) has there the greater part of his fortunes. This is unintelligible if we admit that a mere inheritance alone will confer naturalization on a foreigner.
"Without more authorities and leisure we cannot trace all the re *(504) strictions and modifications tinder which the terms are received in Spain.
The fifth cause in the same law by which naturaleza, is acquired is, in the terms of the law itself (por casamiento), by marriage. Now if the mere circumstance of inheritance confers naturalization, so should it arise from marriage. But by the comments of Lopez we learn that marriage alone does not confer on the hufiband naturalization, but he must fix his domicile in the kingdom with the intention of remaining. If this naturalization be attainable by inheritance it is very extraordinary that it may be lost by a native subject abandoning the country and residing in a foreign kingdom, 1. 5, tit. 24, Partidas, 6; Gloss. Lopez; 1 White’s Recop. p. 26. If the construction be admitted it leads to this absurdity, that a native subject of Spain loses his naturalization by expatriating himself, and an alien in a foreign couutry, without changing his domicile, attains it by acquiring an inheritance in the kingdom. From a provision in law 43, book 2, tit. 32, Recopilación de las Leyes de las Indias, an inference is drawn that a foreigner may have heirs within as well as without the Spanish kingdoms. This may be admitted without affecting the question, for the foreign heir may be entitled to a distributive share of the personal property and yet be excluded from the realty.
In connection with this question reference has been made to 1. 44, book, 2, tit. 32, Recopilación of the Laws of the Indies. The synopsis of this law is expressed as follows: “ Que el entreager bienes de difuntos se examinen los recaudos y no se entreguen, los de estran-geros, ni de naturales a los estrangeros.’’'’ On the delivery of the property of deceased persons, the vouchers shall be examined and neither the goods of foreigners nor of natives shall be delivered to foreigners.
The law is in the following terms: “ Ordenarmis y mandamos a los virreyes y Aiodiencias, qua si personas legitimas, con recaudos bastantes acudieren a pedir los bienes de difuntos, en las Indias, se los manden entregar, no siendo de estrangeros, ni de natu/rales, a estrangeros,” etc.
We order and command the viceroys and audiences, that if ligiti-mate persons with sufficient vouchers shall apply for the property of persons deceased in the Indies, they shall be delivered up to them, not being the property of foreigners nor shall the property of native subjects be delivered to foreigners, etc.
Whatever maybe the proper translation of. this law, it cannot be so construed as to favor the pretensions of a foreigner to inherit real *(505) estate in the colonies. For whether it was intended that neither the property of foreigners nor of natives should not be delivered to aliens, or that the property of natives should not be delivered to foreigners, still to a certain extent it must defeat the claims of foreigners, to take property by inheritance in the colonies. But it is unavailing amidst so much obscurity and doubt, to prosecute this investigation further into the laws of Spain, nor is it absolutely necessary to the decision of the question in this case to determine whether, by the laws of Spain, aliens can or not inherit real property.
The laws on colonization do not contemplate that the land of the new settler shall on his decease become the property of foreigners, for the heirs are subject to the conditions and obligations imposed on the original, grantee, and these could not in the nature of things be performed by foreigners. But whatever may be the true construction of the laws of Spain or of colonization on the subject matter, there can be no doubt that the capacity of aliens to hold lands in the republic of Mexico, if it ever existed under the laws of Spain, was extinguished by the decree of 12th March, 1828, Ordenes y Decretos, vol. 4, p. 155. The 6th article of this decree is expressed in the following terms, viz.: Foreigners introduced and established in conformity with the regulations now prescribed or which shall be hereafter prescribed are under the protection of the laws and enjoy the civil right conferred by these upon Mexicans, with the exception of acquiring landed rural property, which, by the existing laws, those not naturalized cannot obtain.
The acquisition of real property is not only prohibited, but it’ is also declared that by the laws then in force it could not be acquired without naturalization. This provision covers all acquisitions of real property, whether by purchase or inheritance, and is so understood by the Mexican editor of Murillo de Testamentos; see Murillo, p. 99, where the editor, in treating of the wills of foreigners, refers to this decree, and quotes from Mattel, the general rule that immovable property is to be disposed of by the testator, according to the laws of the country where the same is situated. The provisions of this decree are peculiarly stern against' the acquisition of lands by foreigners, and subjects, in its 11th article, all such lands acquired in fraud of the law, to denunciation by any Mexicans to whom they shall be adjudged on proof of the fraud.
The treaty between the United States and Mexico in 1832 has a provision in respect to the disposition of personal property of a succession in one of the countries claimed by heirs in the other, but none *(506) in respect to the real property of descendants. No enabling qualities are imparted by the treaty to the plaintiffs claiming real property.
”We are of opinion that under the plea of alienage, the plaintiffs are disabled from maintaining the action, and there being no error in the judgment of the court below, it is ordered that the same be affirmed.