A. C. HORTON vs. HENRY BROWN — Appeal from Bastrop County.[1]

The doctrines in the case of The Heirs of Holliman v. Peebles, decided by this court at the present term (see 1 vol. Tex. p. 673), recognized and adopted as the law of this case. [1 Tex. 673; 10 Tex. 168; 22 Tex. 155.]

Lands granted to an individual as a colonist who did not establish his domicile in the country, or who, after having been domiciled, abandoned the country, were forfeited, and *immediately* reverted to the government.

To entitle another to a regrant of land thus forfeited, no inquest of office or other judicial proceeding or sentence was necessary under the land laws of Coahuila and Texas as interpreted by the rules prescribed by the civil law of Mexico and Spain.

In the year 1839, the appellant commenced a suit in the district court of Bastrop county against the appellee and the commissioner of the general land office by filing a petition, the substantial allegations of which are in the following words:

"In the month of April, 1835, your petitioner arrived in [79] Texas and became a colonist and a married man, entitled to one league and labor of land as his headright, and on the 18th day of January, 1838, your petitioner applied for and received from the board of land commissioners of Matagorda county, in said republic, his certificate for said league and labor, in conformity with law, etc. That afterwards, to wit, in February, 1838, your petitioner located a part of his headright secured by said certificate, to wit, one league thereof, on a certain tract or parcel of land, situated and being in said county of Bastrop, and known and distinguished on the map

---

[1] This cause was tried before the Hon. R. T. Wheeler, associate justice of the supreme court, and Thomas J. Jennings, Esq., special associate justice, so constituted, in consequence of Chief Justice Hemphill and Associate Justice Lipscomb having previously been of counsel for the parties.

of said county as league number one (1), fronting on the San Antonio road, 5,000 varas, and on the east margin of the Rio Guadaloupe; that said location was duly entered in the office of the county surveyor of said county of Bastrop, in the name of your petitioner, and the field notes thereof recorded in his books; that your petitioner paid all government dues on said land, and caused the receipt of said payment to be forwarded, with the field notes of the survey of said league, to the commissioner of the general land office, by said surveyor. Your petitioner would further represent that the commissioner of the general land office returned said field notes to said county surveyor, and refused to issue a patent to your petitioner, because it appears that a deed of the following description, to wit, a deed executed by Talbot Chambers, as commissioner of Milam's colony, in the spring of the year 1835, to one Henry Brown for league number (1) one, fronting on the San Antonio road and Rio Guadaloupe (being the same league located by your petitioner as aforesaid), is on file in the general land office, and that no judicial decision by a court of competent jurisdiction had declared said deed void and null. Your petitioner further showeth that the said deed ought not and does not, in law and equity, bar your petitioner's just claim to said league, and that the said Brown ought not to hold said land by virtue of said deed thereof, in preference to your petitioner's best right: For, that the said Henry Brown, the grantee of said land, [80] was not at the time of the execution of said deed, or at any time previous or subsequent thereto, a colonist or a citizen of the state of Coahuila and Texas; that the said Brown did not then, or at any other time, nor never has resided in Texas; but your petitioner avers that the said Brown came into Texas at the time aforesaid, to wit, the spring of the year 1835, and departed therefrom in a few days, to wit, fifteen days from the time of his said coming, with the intention of not returning, and that in fact your petitioner says the said Brown never has returned, but is now a citizen of the United States of North America, and owes and pays allegiance to the government thereof, and is and always has been, in fact, in reference to the government of Mexico, the

state of Coahuila and Texas and the republic of Texas, an alien. And your petitioner by leave of the court first had and obtained, and by way of amendment alleges that the said Henry Brown, at the time the aforesaid deed or grant was made to him by Talbot Chambers, commissioner as aforesaid, falsely and fraudulently represented, and caused himself to be falsely and fraudulently represented to said commissioner as possessing the necessary qualifications and requisites to be admitted as a colonist, and to be entitled as a colonist and head of a family to a league of land. Whereas, your petitioner alleges that the said representations were wholly untrue and fraudulent, and that the said Henry Brown had neither wife, child, servant or any other person under his charge to constitute a family at the time of the aforesaid grant in the spring of 1835, nor at any time from the date of said grant to this present time. " Wherefore " (after a prayer for proper steps to bring the commissioner and Brown into court to answer, etc., the petitioner proceeds) " your petitioner further prays that your honor will grant the writ of *mandamus* directed to the commissioner of the general land office, requiring and commanding him to make out and issue to your petitioner a patent to said league of land, and for general relief," etc.

[81] The record then recites a written acknowledgment of the service of " the petition and writ in this case," signed by John P. Borden, commissioner of the general land office, but contains no answer on his part. At the spring term, 1840, an answer was filed on the part of the defendant, Brown, in these words:

" The defendant, by his curator, says that the facts set forth in the plaintiff's petition are not sufficient in law to have and . maintain his aforesaid suit. And this he is ready to verify. Wherefore he prays judgment, etc.

    (Signed)                 " J. W. BUNTON,
                                   " Curator pro Def't."

The action and judgment of the district court are exhibited by the record, in the following entry:

" This day came the plaintiff, A. C. Horton, by his attorney,

and the defendant by his curator, Bunton, and said curator *admits the facts alleged in the said plaintiff's petition,* but demurs to the same as insufficient in law; whereupon it was considered by the court that the demurrer be sustained, and judgment be entered for the defendant. But the court considering the points raised in the case as novel and difficult, it was ordered that they be reserved for the decision of the supreme court. Whereupon it is considered by the court that judgment be rendered in favor of defendant, and the proceedings had in this case be certified to the supreme court as presenting questions of novelty and doubt."

*Gillespie,* for appellant.

The matters presented by the record in this case are few.

It shows that in the year 1835, Brown procured a deed to a league of land, the now subject of controversy, from the commissioner of Milam's colony.

In the year 1838, Horton entered his headright certificate on the same land, took all the preliminary steps to obtaining a patent, and had the field notes returned to the general land office for that purpose. The commissioner returned [82] them to the surveyor's office, with the reason for his refusing a patent to Horton for the land described by them, " that it was upon and included the land claimed by said Brown in Milam's colony."

Horton then filed his petition or bill in the district court where the lands lay, alleging that the deed to Brown was procured by false and fraudulent representations; that in truth and in fact he, said Brown, was never entitled to land as a colonist; that he was merely a visitor to the country and left and abandoned the same a few days after he procured the deed to the land. Horton insists in his said bill that the deed to Brown was and is a nullity; that nothing passed to him by said deed, and consequently the land claimed by it remained vacant and was then liable to his location.

The commissioner general is made a party and the prayer is, that the title of Brown be set aside and a patent issued to him, Horton.

Brown appeared by his counsel, and filed a general demur-

rer, intending thereby to admit all the facts alleged by Horton as true, which was so considered by the court, as appears by the record.

The demurrer was sustained, from which Horton appealed.

The appellant insists that the court erred in sustaining the demurrer.

That the title set up by Brown, having been obtained by fraud, was void and null; that he took nothing under a deed procured by his own fraudulent devices, and consequently the appellant, who had a claim upon the government, had a right to locate any lands that had not been otherwise lawfully appropriated. It is the policy of the law to make it the interest of all persons to investigate and suppress frauds. It is their interest to take care of the public good.

By all law writers, fraud has ever been held so odious as to vitiate and nullify everything that it touches or comes in contact with. It will vitiate and destroy the most solemn proceedings of courts of record. 2 Stark. Ev. 339–40; 2 [83] Coke, p. 80, note 3; 2 Bl. Com. 286–7; 3 Cruise D. 47; Story's Conf. 499 and note; 1 Johns. Ch. 405; 1 Vesey, 120, 284–9; Barwick's case, 3 Coke, 94. A patent obtained by fraud is utterly void. 2 How. (U. S.) 581; 3 Ala. 47–9.

I would particularly press on the consideration of the court, the reasoning of the great Coke in the case referred to. Human nature has not changed since his day.

The officer of the government for the distribution of public lands was intrusted with particular and special duties. If he was imposed on or deceived in the issuing of a title, in fraud of the law, it would be contrary to law, and of course null and void, as much as if a forged deed was attempted to be forced on the country; for whatever is done in fraud of the law is done in violation thereof. 2 Pet. Dig. 356; 4 U. S. Con. 71.

There is no difference as to the effect on the public; there is none as to the morality of the act. And if we apply to the principle settled by the supreme court of the United States, no right through Brown's own fraud could vest in him, "those who came in under a void grant can acquire nothing." 7 Pet. 231. Same doctrine in Legate's case, 5 Coke, 110; 2 Bl. Com.

394; Bac. Abr. tit. Void and Voidable, 337; Cowp. 434; 3 J. C. R. 481; 3 Wend. 411; 1 Fonb. Eq. 122, section 8 and notes; Stoddard v. Chambers, 2 How. U. S. 318. Same doctrine held in Louisiana reports, that fraudulent contracts are void *ab initio*. 3 Louisiana Cond. 477; id. Benj. and Slidell's Dig. 274. This principle seems to be universal.

In the New Pandect of Roman Civil Law, page 526, this principle is laid down: " That if a contract is procured and made by fraudulent devices, it is absolutely null and void. And particularly when the contract is with the prince." See also Puffendorf, 281 and notes.

Story says fraud is more odious than force. Story Eq. [84] sec. 186. According to this Brown stood in no better attitude before the court than a robber.

In 2 Vesey, Jr., this principle is laid down: " That a void deed having passed nothing, a reconveyance is unnecessary, page 294; " id. 2 Johns. Ch. 512; 4 Johns. 597; 8 Ves., Jr., 283; 4 Phil. 88; Rob. 525.

When public utility is concerned, fraud vitiates any transaction which in its effect would tend to public mischief. Public Utility, Rob. 538; Hovenden, 13.

In 1 White, 304-6, it is stated that a sentence against law and justice is absolutely null and void, and there is no necessity of any other proceeding to set it aside. Id. 244, Fraud on Governments.

It was the policy and object of the Mexican government at the time of the pretended emanation of Brown's title, to settle the country with actual cultivators of the soil; as is most conclusive from a mere glance over the numerous ordinances, decrees, etc., passed by her legislature on the subject of settling her wilderness territory.

Such has been the constant object of the Spanish colonial governments since the establishment of the laws of the Indies. See White's Recop. 48-54. A like system with the same object in view to that adopted by Mexico, and subsequently by the states of Coahuila and Texas, was long in force in the now states of Louisiana and Florida. And as many cases arising therefrom have subsequently been adjudicated in the state and

United States courts, we may well look to their determination of like questions for some light on this subject.

As to the mode in Louisiana, see White v. Wells, 5 Martin, 662; Fletus v. The Mayor of New Orleans, 1 N. S. 438; 2 White, 229–30, 280–5.

The law expressly stipulates the terms and conditions upon which the colonists can acquire a legal title. They must conform to the law; the terms and conditions are precedent and must be complied with. Kingley's case and the Heirs [85] of Mills, 12 Pet. 215, 477, 485; White, 49, 52, 132, 284, 88, 258, 296; 1 La. Cond. 128; 4 id. 431; 3 id. 446; 2 Lou. 507; 6 Pet. 747.

The mass of Florida cases can be ranged under three classes.

Absolute grants in consideration of services already performed or passed, as in Perchman's case, 7 Pet. 51; 2 White, 280; 2 Pet. Dig. 311–17.

Next, grants for important services and considerations already passed with future stipulations and promises by the grantee, as in the Arredondo case, 6 Pet. 710; 10 id. 306–8.

Lastly, the great mass were, like those in Coahuila and Texas, concessions or incipient grants permitting a present possession, and securing a future absolute or fee simple right, on certain conditions prefixed to the grant, always having in view the settlement and improvement of the country; which considerations were as essential to be performed as the payment of money to the country. 12 Pet. 477–85; 14 id. 340; 15 id. 224 and 76; 10 id. 313; 9 id. 168; 2 White, 289–90, 386.

Although in Seton's case, 10 Pet. 309, and in Sybold's case, their claims were judged valid on the doctrine of *cy pres* compliance; they having proved they made repeated efforts to comply and were prevented. The same principle contained in Huidekoper's Lessee v. Douglass, 1 U. S. Cond. 446.

Such, also, was the law in the Indies, and if not complied with they were taken back and given to another. 2 White, 62, 64, 71, 300, 301; Strother v. Lucas, 12 Pet. 441, etc.

By compliance, they received an absolute grant or royal title. 2 White, 283.

Brown, having received the deed with the conditions there-unto annexed, during the existence of the civil law, it may be well to see what was its import. 1 Part. 465. It is laid down as the nature of a condition, that if accomplished, it confirms the contract; if not, the contract is invalid. The [86] common law definition, as found in 4th Bac. Abr. 165–6, would not be much more favorable. We look on the matter in this way: Brown's title is the evidence of the contract between him and the government. The circumstance of his having a deed cannot place him in any better situation than an emigrant who has arrived in the colony with his family, with all the qualifications requisite by law, received and admitted by the empresario and commissioner; his quota of land surveyed for him, and he put in actual possession. Could the party last designated claim the absolute title or fee without showing a compliance on his part? Then can Brown? His title is only *prima facie* evidence of the existence of the facts which entitle him to the land. This presumption is destroyed by the facts admitted.

The officers of the government, who made out the title for Brown, were the attorneys in fact, with the law for their guide. Whatever the law has given passed, and no more; beyond the law, no public officer could extend its operation.

If the law impose a condition precedent to obtaining a right, without the performance of that condition, no right could ever vest. The documents that were given him, to serve as a title, would be as blank paper, and it would be idle to speak of a forfeiture or anything else, to divest what had never vested.

At the common law, future conditions in a grant must be performed, and must be so found. 8 Term, 56; 2 Bl. Com. 154, 107, 86; 5 Coke; 94, Barwick's case, 6 id. 56; 2 Cruise's Dig. 3, 32.

When an act of forfeiture takes place by a man's own act, any person, even a stranger, may enter. Pennant's case, 3 Coke, 65; Wilson v. Mason, 1 U. S. Cond. 251; 5 Hay. 263; 2 Term, 749.

Having, then, established that the deed of Brown is, and

was from the beginning, null and void, I maintain that the plaintiff had the right so to consider it; and that he has pursued the proper course to establish his own claim. He has [87] shown that he held a good and valid certificate for lands, which the government promised to satisfy out of her public domain. This gave to the appellant the right to look into the state and character of the funds to which he had to look for payment. The claim of Brown can certainly stand in no better situation against the government of Texas than it did against that of Coahuila and Texas.

If it was void as to them, it surely will be as to the republic of Texas.

If, then, the pretended claim set up by Brown was void as against the republic of Texas, the means by which it was obtained from that government may be inquired into by any person having a just claim against the common fund, thus fraudulently appropriated to his prejudice. In the case of Polk's Lessee v. Hill, Wendell et al., 3 U. S. Cond., 291, on this subject, the supreme court of the United States say, that it would be extremely unreasonable to avoid a grant for irregularities of the officers of government, whose duty it is to supervise all the proceedings from the commencement to the consummation. But that there are some things so essential to the validity of such a contract that the great principles of justice and of law would be violated, did there not exist some tribunal to which an injured party might apply, in which the means by which an elder title was required might be examined into. Id. 5 Coke, Legate's case, 111, 115.

What other means pointed and allowed by our laws could the appellant have pursued? None other. By the common law, the party who conceived himself aggrieved could avail himself of the invalidity of the same in any shape or form of action in which it might be presented. In ejectment most certainly. In the courts of the United States some contrariety of opinion prevails, but that he could do so in equity, all agree. 3 U. S. Cond. 291; Term, 214, etc.

Our proceeding is in the nature of a bill in equity. We set out our claim; we show the interference or prevention of its sat-

isfaction; [88] we ask that the intervening claim be annulled, and that the officers of government be compelled to allow and consummate ours,— all the qualities of a bill in chancery.

But we further insist that should the court not be inclined to treat the claim of appellee as a nullity absolute, that the record in this case shows that the appellee has no right or claim to the land in dispute. It shows that he was a colonist and received his title papers, now insisted on as such. It is important to understand the character of the claim he held.

It was under the law and must conform to it. Was it an absolute conveyance by the government of the lands? A title to the property in fee? or was it an agreement for such, under conditions and limitations, both in the law and in the deed? That it was the latter is most manifest, when we consider the object of the donation and policy of the government. Mexico was endeavoring to settle a wilderness. The most practicable plan she could adopt was the empresario system. She gave large boons to empresarios and held out great inducements to the actual settlers. She said in emphatic language to the empresario, if you fail in your contract, if you introduce ninety-nine settlers and not the hundred, the whole contract shall be absolutely null. Col. Law, 1825, sec. 8.

It cannot be supposed that she would be more favorably inclined to the colonists than to the empresarios themselves. If the colonists fail on their part, the objects of the government are subverted.

But they did not receive a fee simple title; they only received a conditional one, that was to serve them as a title. Instructions, 1827, secs. 7 and 8.

These could only be considered as merely conditional fees. No entry or other proceeding was necessary to divest the imperfect estate out of the colonist who failed to comply with conditions expressed in the grant, or the law under which he held. Noncompliance, *ipso facto*, revested the estate in the original grantor, the government.

[89] As the case put in the first instance, of Coke, 218, where land was granted to a man, that if in five years he pay forty marks he should have a fee, but if not, his estate to con-

tinue five years; on failure no entry is necessary, the estate is gone. Id. 2 Cruise, 38–41, note.

The act of law, without office found, would cast the estate on the grantor. 3 Bl. Com. 256–7; 4 Bacon, 416, 165–6.

Wherever the law declares a forfeiture, or that a deed or grant obtained under particular circumstances void, there is no necessity of any direct judgment or decree to render it a nullity. 2 Term, 568, 515; 1 Stuart, 18; 4 Porter, 141; 5 id. 182; 8 id. 325; 7 Mart. 341; 5 id. 54.

And any circumstances of invalidity may be shown, in any possible action, before the repeal of a conditional grant. 1 Coke, 52; 2 id. 17, 33, 54; 5 id. 94; 6 id. 56; 10 id. 67, 109.

*Webb*, for the appellee, presented the following propositions, as being sustained by the record and the law:

1st. The land in controversy *was* granted to Brown, by an officer of the government having full power and authority to make the grant. The authority of Commissioner Talbot Chambers is not denied. Arredondo's case, 6 Pet. 727–8–730.

2d. The terms used to characterize the grant import that *"the right, title, legal estate, property* and *ownership"* of the land had passed from the grantor to the grantee. The grant must be taken as an absolute and unconditional one, unless the contrary be shown. Id. 6 Pet. 744.

3d. *"Grant"* is a generic term. It may be applied in its lowest sense to a bare permission to do a thing, as in the case of Kingsley, 12 Pet. 476. But when applied to the *conveyance* of land as a technical term, it is then one of the strongest words in the English language to show that the conveyance was an absolute and unconditional one.

4th. The court will never infer or imply that there are conditions [90] to a grant which do not appear on the face, unless the law under which the grant is made imposes them. 10 Pet. 306.

5th. The court will never presume fraud in a transaction which can be ascribed to an honest motive. No number of frauds which a man may have perpetrated through the course of his life will vitiate or affect a transaction not directly connected or tainted with them. Fraud, to affect an act, *must*

*attach directly to the act.* 6 Pet. 716; 1 Domat, 257; Pothier on Obl. 24, Nos. 31, 32.

6th. If there be a law, under which the grant could have been made, without its being affected with the fraud alleged in the petition, the court will suppose that law to have been the one under which it was made, until the contrary is shown. 6 Pet. 716.

7th. If Brown were a purchaser under the law of 1834, p. 247, no allegation of fraud contained in Horton's petition could be made to apply to his grant.

8th. The fact that the title to Brown was made by Talbot Chambers, the "commissioner of Milam's colony," does not repeal the presumption that the land was purchased by Brown under the law of 1834, because there is nothing to show that he was not either a "general" or "subordinate" commissioner, which that law authorized. He may have been a commissioner of Milam's colony, and also a commissioner of Texas, to convey lands sold under this law; there is nothing incompatible in the two appointments. If he were a *subordinate* commissioner, his duties may have been confined to "Milam's colony," as by the law, the district in which he exercised his functions was to be limited.

9th. If an officer of the government, *acknowledged to be so,* do an act *virtute officii,* the act will be considered as within the scope and power of his authority, until the contrary be shown. The *onus probandi* lies on the party denying the validity of the act. 6 Pet. 729.

[91] 10th. If an act be done by an officer whose duty it is to judge of the performance and rectitude of the steps which are to precede it, the doing of the act is a determination and judgment that the precedent steps have been performed, and were performed in good faith. The act is *res adjudicata* of the preliminary and precedent steps. 2 U. S. Cond. 291.

11th. If this were an absolute and unconditional grant of the land to Brown (and the terms employed to characterize the grant import it to have been such), the fee to the land was vested in the grantee immediately upon the execution of the grant, and the grant was indefeasible.

12th. If Brown acquired this land by purchase under the law of 1834, the only condition which could have attached to the grant was the one of settling in the state within twelve months. This was a condition in law and subsequent to the grant. Laws C. and T. p. 248, art. 9.

13th. The conditions of taking the oath to support the constitution and laws, etc., and of becoming naturalized in one year, were conditions *precedent* to the grant and must have been performed before the grant could have been made. The making of the grant, therefore, is conclusive proof that these precedent conditions have been performed. Laws C. and T. p. 248, art. 8.

14th. The only condition which followed the land in the hands of Brown, to wit: that of settling in the state within twelve months after the grant was made, being one to be performed subsequent to the grant, the fee vested in the grantee *eo instanti*, upon the execution of the grant, and it being a condition reserved for the benefit of the grantor, he alone could inquire into its performance or non-performance — third persons had nothing to do with it. 4 Kent, 122, 125–8; 2 Bl. Com. 154–6; also p. 110, notes 15 and 16; 1 Pet. Dig. 528, secs. 20, 26.

15th. If the fee vested in Brown upon the execution of the grant, and the grantor sought to divest and reclaim it for the non-performance of a subsequent condition running with the [92] land, he could only do it by a judicial inquiry and investigation in the nature of an inquest of office, showing that the subsequent condition had not been performed. Until " office found," the grantor *himself* could not enter upon or take possession of the land. This principle is recognized both by the common and civil law. 3 Jacob, 454–5; 3 Bl. Com. 257; 2 Pet. Dig. 328, secs. 18, 19, 20; id. 312, secs. 9, 10; 2 Pet. Con. 622–33; 9 Pet. 742–3; 1 Munf. 134; 2 White's Recop. p. 52, Nos. 84, 87. The six questions of Gaudo and the answer of Saavedra thereto, 2 White's Recop. 274, 282. Argument in Revant's claim, 1 White's Recop. 723; 6 Pet. 747; 9 id. 743; 2 Domat, 372, sec. 4.

16th. It is of no consequence whether the fee which vested

in Brown was a *fee simple*, or *fee conditional* was the *fee*, and if it had passed, it would have to be reclaimed, before it could be *reinvested* in the grantor.

17th. If Brown obtained this land as " a colonist," or " head of a family," and the fraud charged in the petition attached to the grant, still no person but the grantor would have a right to set aside the grant for the fraud. If he was content to submit to it, no third person would have a right to complain or inquire into it. If A. cheats B. out of his horse or land, C. would have no right to sue for or take possession of either.

The former rights of Mexico in the land, having by the revolution inured to Texas, the government of Texas alone could inquire into the terms upon which the grant was made, and seek its forfeiture or annul it, for the fraud which was practiced in obtaining it.

It is true the government might authorize others to make the inquiry, but until the authority be given, no third person could interfere. 5 Bacon, 337, letter F.

18th. A grant fraudulently obtained is voidable, and not void. And none but the grantor or his heirs could avoid it. [93] 5 Bac. Abr. old ed. p. 337, letters E and F, tit. Void and Voidable; Pennant's case, 2 Coke, part 3, p. 65.

19th. If a grant of land were obtained by fraud, and before the grantor avoided it, the land was conveyed to a third person for a valuable consideration, who was an innocent purchaser without notice of the fraud, the land could not be reclaimed from him; and this shows the grant in the first instance to be voidable only.

20th. To avoid a voidable grant, a judicial inquiry and decision is as necessary, as it is to reclaim a fee which has vested in the grantee, for the nonperformance of subsequent conditions; and none but the grantor or his heirs can institute that inquiry.

21st. There is but one possible case in which a third party could inquire into the validity of a grant of this kind, and impeach it for fraud. And that is, where the grant affected his *pre-existing rights;* and it will not be pretended in this

case that Horton had any right to the land in controversy when the deed was made to Brown. 2 Bibb, 134; 1 Bibb, 22, 229.

22d. The commissioner, Chambers, was an officer appointed by the government to determine who were entitled to lands as "colonists," or "heads of families." His duties in this respect were judicial, and his decision upon the application of a party for lands was a judgment which determined that question. Can this judgment be inquired into collaterally? I think not. He certainly had jurisdiction over the subject matter. 2 Day, 30; 1 Pickering, 439; 3 Johns. 168; Voorhees v. United States Bank, 10 Peters, 443; Grignon's Lessee v. Astor et al. 2 How. U. S. 319; 2 Bibb, 487; 3 Bibb, 137; id. 426; 7 Dana, 141; 4 Yerg. 525.

23d. Articles 26, 27, 28, and 30 of the colonization law of 1825, p. 20; and arts. 30, 31, 32, and 33, of the colonization law of 1832, p. 193; and arts. 4, 8, and 9, of the commissioners' instructions, p. 71, all show that the colonists received full *titles* to their land in the first instance; the fee [**94**] therefore vested in them subject to be divested upon the nonperformance of the subsequent conditions. Laws Coahuila and Texas.

24th. How could the grantees dispose of their land as authorized by arts. 27 and 28 of the colonization law of 1825, and by art. 31 of the colonization law of 1832, if the fee was not vested in them?

25th. Articles 26 and 30 of the colonization law of 1825, and art. 33 of the colonization law of 1832, show that an inquiry and decision is necessary to divest the colonists of their lands previously acquired. How is the political authority to proceed to *take back their lands and titles* under article 26, unless it does something? And what is that something to be done? And how is it to be ascertained under articles 30 and 33, that the colonists did not alienate their lands according to the law, unless the matter was inquired into, by some tribunal authorized to make the inquiry? This inquiry is an inquest of office. The decision upon it is, "office found."

Again, how could the political authority "proceed to take

back the land and titles " of the colonists unless the colonists had previously obtained their land and titles?

26th. Article 15 of colonization law of 1825 presents an illustration of a condition precedent to the grant, and shows the difference between that and a condition subsequent as defined by art. 26. Unmarried men are to receive only a fourth as much as married men, but if they marry, the quantity shall be made up. Their right to this additional quantity depends upon the performance of this condition precedent of marrying, and until they do marry, their right does not vest, but still it exists. But their right to the fourth vests immediately. They receive the land, and their titles for it.

27th. If there was any law which authorized private individuals to hunt up land that ought to be forfeited for a non-compliance with subsequent conditions, or because the grants were obtained by fraudulent representations; and to denounce [95] them and obtain a decree of forfeiture, and thereby obtain a grant to themselves of the same land, then the appellant might have instituted an inquiry as to the mode by which Brown obtained his land. But there is no law giving any such power or authority; on the contrary, it is made the duty of the " political authorities," or agents of the government, *alone* to do it. 5 Coke, 109.

28th. If the grants made to the colonists, or purchasers of land under the government of Coahuila and Texas, were *permissions* to go upon the land to do certain specified acts, as in Kingsley's and all that class of the Florida cases, then there would be a good reason for saying that they were conditions precedent, and that a title *to the land* had to be made after the conditions were performed. But it is the first time I have heard it asserted that all the titles made to the colonists in Texas had to be renewed or confirmed after the expiration of six years from the time they received their grants, and upon their showing that they had performed all the conditions required by law. If this proposition were true, then there is not a good Mexican title in Texas, for none of them have been confirmed in this way. 12 Pet. 476, 215.

29th. The Mexican titles in Texas are not mere concessions.

They are like the grant in‘Arredondo's case, absolute and vesting the fee *eo instanti* in the grantee upon making the grant, having condition, however, running with them, upon the nonperformance of which, the grant may be opened and the fee divested, *if the grantor think proper to reclaim it.*    6 Pet.

30th. There is, besides, this broad distinction between all the Florida cases and the present one. There the parties were seeking to establish their grants. They voluntarily went before the courts, to allege and show that their grants were honestly obtained, and that they had performed all that was required of them by law to perfect them. The *onus probandi* was upon them. But here the grantees have never been called upon by any law or regulation of the government to [96] show that their titles were perfect and all the conditions performed. Had Texas after her revolution thought proper to subject them to this ordeal, they would then have had to do what was done in Florida, show that their titles were good. But Texas has required nothing of the sort, and no third person has a right to do it, or to interfere in the matter.

After stating the facts of this case, the opinion of the court was delivered by THOMAS J. JENNINGS, Esq., special associate justice, as follows:

After this cause was argued in a manner manifesting great ability and research, and submitted to us for consideration, the opinion of the court was delivered by the chief justice in the case of The Heirs of Kinchen Holliman v. Robert Peebles, 1 Tex. 673. As we fully concur in the reasoning and conclusion of the court in that case, that opinion turning, as it does, upon facts which are of like import in both cases, but which are even more fully exhibited and definitely ascertained in the record before us than in that case, is decisive of this cause. The doctrine advanced and fully sustained by argument and authority in that opinion, when applied to this case, decides that the defendant, by not in fact fixing his domicile in Texas, and by admitting that he never intended to do so; or, if he ever had his domicile in this country, by transferring it to a foreign country, with a declared and admitted intention of

never returning; or, in other words, by *abandoning the country,* would have forfeited his title under the colonization law under which he claimed, and the land in controversy would have *immediately* reverted to the government, even if the defendant had, previously to such abandonment, attained the *status,* by acquiring the qualifications, of a citizen, and performed the condition of cultivation imposed by the law of his grant.

2. And that to entitle another to a regrant of land thus forfeited and reannexed to the public domain, under the land laws of Coahuila and Texas, as interpreted by the rules prescribed [97] by the civil law of Mexico and Spain, no inquest of office, or other judicial proceeding or sentence, was necessary.

Tested by these rules the defendant, upon the state of facts presented by the record, had no valid title of *any grade* to the land in controversy, when the petitioner applied for a patent for the same, and the claim of the defendant constituted no legal obstacle to the success of the petitioner in that application. We are, therefore, of opinion that the judgment of the district court ought to be reversed; but we are asked to go further and give such judgment as the district court ought to have given, upon the facts and admissions presented by the record.

The authority of Mr. Bunton to represent the defendant in the conduct of this cause appears to have been fully recognized in the court below, and has not been called in question here. The fact that a general demurrer to the petition had been filed by him shows that he was not unmindful of the difference, in legal effect, between " the implied admission for the sake of argument " of the truth of facts, which that plea imports, and the express and positive admission of " the facts alleged in said plaintiff's petition," stated in the entry of the judgment of the court to have been made by him in the name of the defendant. It may be urged that the statement of this admission and what immediately follows it is but an awkward entry of the action of the court upon the demurrer. This may possibly be so, but we can only know the grounds upon which the court proceeded in rendering its judgment from the language of that part of the record which purports to state them. And *that language,*

in this instance, we think, imports that this cause was submitted to the court for decision upon the *admitted truth of the facts stated in the petition*. And this opinion is fortified by a stipulation in an agreement signed by the counsel of both parties (contained in the record) " that the pleadings in the case shall be sent up to the supreme court for adjudication and decision, without any other *statement of facts* accompanying the record." Now [98] there was no evidence offered in the case, as the manner of proceeding indicated by the entire record shows, and what can the phrase, " *other statement of facts*," be intended to have its contrasting reference to, if not to the " statement of facts " contained in the petition (a part of the pleadings), and verified by the defendant's admission? Wherefore, it is ordered, adjudged and decreed that a judgment of the district court be reversed, and that the *mandamus* issue in accordance with the prayer of the petitioner, on payment of all costs by appellant.

----

BOARD OF LAND COMMISSIONERS OF NACOGDOCHES COUNTY VS. HENRY RAGUET AND WILLIAM G. LOGAN — Appeal from Nacogdoches County.

The holders of all orders of survey of headrights, whether original claimants or their assignees, must prove all the facts required by the 12th section of the land law of 1837, and in the mode therein prescribed.

In suits brought in the district courts to establish headright claims, it was necessary to prove the same facts which the statute required to be established to the satisfaction of the board of land commissioners before a certificate could be obtained.

The material facts of this case are stated in the opinion of the court.

*Harris*, Attorney General, for appellant.

*Kaufman*, for appellees.

No brief furnished the reporters.

Mr. Justice LIPSCOMB delivered the opinion of the court.

This case was originally commenced by the present appellee,