## Maria Josefa Cavazos v. Manuel Trevino and Others.

1. Plaintiffs, in an action of trespass to try title, offered in evidence, as a muniment of their title, a copy of a testimonio of a title of possession executed in 1829 by an alcalde of Matamoras, who, in 1857, appeared before the United States consul at Matamoras and acknowledged the execution of the testimonio. The document offered comprised not only the land in controversy, but also two adjacent tracts conceded to other grantees, and also the final title to one of these other grantees, which last instrument bore the signatures of the then Governor and Secretary of the State of Tamaulipas; and the United States Consul, besides authenticating the acknowledgment of the alcalde, certified that two certain affiants appeared before him and made oath that the Governor and Secretary were both dead, and that their signatures were genuine. On these proofs the document was recorded in Cameron county, and was now offered as a recorded instrument. The defendant objected, alleging that it was not such an instrument as was permitted by law to be recorded, being a copy of a title to land issued by the State of Tamaulipas, a foreign government, and not a patent issued by the Republic or State of Texas, nor a copy of a title or paper found in the General Land Office. *Held*, that it was not error to overrule these objections, and to admit the document as an "instrument of writing of and concerning lands and tenements," entitled to be recorded under the act of May 12, 1846. (Paschal's Digest, Article 5001, *et seq.*)

2. The prohibition against the colonization of the twenty border and ten littoral leagues, contained in the National Colonization Law of Mexico (Article 546, Paschal's Digest), had no application to grants of land to citizens of Mexico; it applied only to foreign colonists. (Arguello v. United States, 18 Howard, 548, cited by the court.)

3. The Colonization law of Tamaulipas did not, in all cases, limit grants of land to five leagues. It was competent for the Executive of that State, on a proper showing of the necessities of the grantee, to nearly double that quantity; and as that functionary was the proper judge of such necessities, this court will not question his exercise of the power.

4. This court has repeatedly announced that it will defer to the political and judicial authorities of other governments in the administration and interpretation of their own laws; and this doctrine applies to grants within the littoral leagues made to Mexican citizens by the political

authorities of Tamaulipas, even after the promulgation of the National Colonization Law of 1824.

5.  Long continued and peaceable possession under a Mexican grant, undisturbed by any action of the political authorities, raises a presumption that the grant was regularly and legally made under the laws of Mexico.

6.  The case of Cavazos v. Trevino, decided by the Supreme Court of the United States, and reported in 6 Wallace, 773, referred to, and the rulings therein approved.

APPEAL from Nueces.   Tried below before the Hon. M. P. Norton.

This cause was decided in the District Court as long ago as 1858.   It was instituted in the county of Cameron, within which the land in controversy is situated, and the petition was filed in the district court of that county on the ninth of April, 1852.   The venue was changed to the county of Nueces.

The land in controversy was an extensive tract comprising five and a half leagues, and extending from the mouth of the Rio Grande for some distance up that stream.   It is known as the "San Martin grant," and is one of the specified tracts to which the State of Texas, by act of the Legislature of February 10, 1852, relinquished all claim in favor of the original grantees, their heirs or assigns.   (See Paschal's Digest, Article 4461, No. 35, under the caption of "County of Cameron.")

The original grantee of this tract was Ignacio Trevino, and his heirs and administrator are the plaintiffs and appellees in this cause.   The grant itself was made in the year 1829, by the authorities of the State of Tamaulipas, within whose dominions the land lay.

Maria Josefa Cavazos, the defendant and appellant, was part owner of the still more extensive grant called "El Espiritu Santo," which comprises fifty-nine and a half leagues, or something over two hundred and sixty

thousand acres.  She claimed under Don Salvador de la Garza, the original grantee of the Crown of Spain, in the year 1781.  Her defense was, that the lands known as the San Martin, and now in controversy, were comprised within the limits of the Espiritu Santo grant, and she asserted this by plea in reconvention also.

The material facts involved in the questions raised and decided are disclosed in the opinion of the court. The case of Cavazos v. Trevino, reported in 6 Wallace, U. S. Reports, and referred to in the opinion of this court, was an action brought in the District Court of the United States, at Brownsville, Texas, by the appellant in the present cause against the appellees, for the recovery of the same land.  The report of that case, therefore, will afford further details respecting the litigation to such gentlemen as desire more specific information than that here furnished.

· The written arguments filed in this cause, by counsel on both sides, on an application for a rehearing as well as on the original submission of the case, were very able and elaborate ; and the Reporter is well aware that the extracts now presented with this report do the counsel but scant justice.  This, however, is often unavoidable, in consequence of the limited space allowable to the arguments of counsel.

The motion for a rehearing was overruled.

*W. G. Hale*, for the appellant.—I.  The deposition of Domingo de la Garza was not properly taken ; the person taking it not being a notary public at the time ; and the objection to its admission ought to have been sustained.  A notary accepting the office of county clerk vacates his office as notary. (Const. State, Art. 7, § 26 ; Biencourt v. Parker, Galveston, 1864.)

In this case Fry was not even a notary *de facto*, for

he declined to act, except at the *risk* of the plaintiff's attorney.

II. The document, marked A., purporting to show the proceedings which led to the issuance of the title to Ignacio Trevino, was improperly admitted in evidence ; for,

1. The deposition of Domingo de la Garza, upon which it was offered, was itself improperly admitted, as before shown.

2. That deposition stated that the document was a copy of the *testimonio* of title; and did not state that it was a copy of the *protocol* of title.

3. The document was not legally recorded ; for only patents from the Republic or State, or copies of titles in the General Land Office, could be properly recorded. (Hart. Dig. 2789, 2800.)

It will not do to say that the act of 1846 authorized the recording, because the act of 1846 specified particularly the classes of document emanating from the government which could be recorded, and by necessary intendment excluded all others. The paper offered by the plaintiffs was only a foreign copy—not even the testimonio.

III. The document B. C. was not properly recorded, and the other papers offered in connection therewith— the grant, survey, etc.—were improperly admitted, because, at best, they only tended to show a void grant.

1. Because they showed a grant of land within the littoral leagues, without the consent or approbation of the general government. (Edwards *et al.* v. Davis *et al.*, 3 Texas, 321 ; Republic v. Thorn, 8 Texas, 499 ; Smith v. Power, 14 Texas, 146 ; Rec. de Indias, IV, Tit. 7, Ch. 6, Gen. Col. Law, Aug. 18, 1824.)

The attempt on the part of the plaintiff's counsel to distinguish this case from those already decided by the

court, on account of a supposed difference between the laws of Tamaulipas, and of Coahuila and Texas, is entirely unfounded, because the General Colonization law of 1824 imposed the restriction, and of course applied to all the States alike.

2. Because the alleged grant appeared on its face to include over five leagues of land, and was thus prohibited by law, and not within the power of the officers to make. (Col. Law of Tamaulipas, Art. 25 ; Patterson v. Winn, 11 Wheat. ; U. S. v. Cambuston, 20 How.) And as it is impossible for the court to revise the survey so as to exclude the excess, the whole grant must fail. Nor can the authorization to make two grants to the same person permit more than five leagues to be united in one grant, because both clauses must be construed together and have proper effect, and the construction must therefore be, that while two grants may be made *in different places* to the same person, both grants together shall not comprise more than five leagues.

3. Because it appears that no citation was served on Francisca Cavazos or the defendant, then co-proprietors of the land ; and the proceedings and grant were therefore void as to them. (Col. Law, Tamaulipas, Arts. 22–9 ; Curia Filipica, I. 12, 2.)

IV. From an examination of the Espiritu Santo grant, under which the defendant claimed, as it appears in both translations, it is clear that it included the land in controversy. The contest as to this point may be reduced to a narrow compass. It appears that after the grantee, Salvador de la Garza, had been in possession of a large tract of land, extending down to the coast, for about eleven years, he denounced it as vacant public land, and applied for its purchase. His application was granted ; and in the proceedings pre-

liminary to the survey, five witnesses were called to identify the land denounced. They all stated that the tract was a natural enclosure (potrero), bounded on the south by the Rio Grande; on the east by the sea and lagunas communicating with the sea; on the north by the Aroyo Colorado; and on the west by a dense thicket extending from the aroyo to the river. The "Vista de ojos" was ordered, and resulted in the same conclusion as to boundary. The survey of this tract was then ordered and made; but the surveyor did not meander, but run straight lines to the cardinal points, making an interior square of these. The line on the east of the square ran from a place called "El Tanque," on the Rio Grande, northward till it struck the Laguna Madre, leaving on the eastward a considerable tract of land between this line and the Gulf and laguna, which, it is contended by the plaintiffs, was thus excluded from the Espiritu Santo Grant. The defendant contends that a careful examination of the whole title, and the application of well known principles of law, will satisfy the court that the Espiritu Santo Grant included all the land to the coast.

In applying a construction to the Espiritu Santo grant, all the proceedings leading to the final title are to be considered together. (Landes v. Brant, 10 How., 372; Yontz v. U. S., 23 How., 498.) The grant contains four distinct parts; first, the denunciation and identification of the land; second, the inspection; third, the survey; and fourth, the formal grant. The general intention of the private applicant appears, in all these, to obtain a large tract of land, enclosed by natural boundaries, sufficient to contain his cattle and prevent their wandering. The particular steps taken to obtain this object will appear by examining each part of the title.

1. The denunciation. The five witnesses summoned to identify the land and testify to the merits of the applicant, all describe it as bounded on the east by the lagunas of the sea, and state its principal advantage to consist in its being a natural enclosure or potrero. Salvador de la Garza was the first who entered it, and he put up a fence or bars, at the opening, which he cut through the western line of thicket.

2. The inspection, or "Vista de ojos." This proceeding is peculiarly intended to identify the land. (Ordenanzas de Tierras y Aguas, 5 Ed., p. 217.) In this, also, it is recited that the land to be granted extends to the lagunas of the sea, and includes the "recesses, angles and bends" of those lagunas.

3. The survey. It seems that the official surveyor ran four general lines toward the cardinal points, making a quadrilateral figure, in order to calculate the quantity. The first line began at a watering place in the southwestern corner of the tract; thence ran east five hundred and eighty-four cordeles (one hundred cordeles make a league in length), and there terminated six cordeles below a tank near the Rio Grande. The second line began at this last point, and ran north nine hundred and ninety-three cordeles, intersecting the heads of the bends or indentations of the shore, and terminated in a pocket or large bend of the Laguna Madre, on the shore of the laguna. The third line began some distance northwest of the termination of the second line, on account of the interposition of an arm of the laguna; thence ran west, along the margin of the Aroyo Colorado, three hundred and nine cordeles; there being stopped in that direction by the stream, turned south one hundred cordeles, and there ceased on account of the difficulty of pushing the survey further west from obstacles interposed. The surveyor,

however, estimated the total westing of this line to be the same as the easting of the first line, and began again at a point north of the beginning point, where was the fence which the grantee had placed at the opening cut by him in the chapparal; thence ran south two hundred and twenty-five cordeles to the beginning point, estimating the total length of this fourth side of the figure to be seven hundred and twenty-five cordeles, *i. e.* from the arroyo to the Rio Grande. And the surveyor then calculated the quantity of land within these four lines, and including "the bends and elbows which the Rio Grande makes belonging to the first line," to be fifty-nine leagues and eleven and a half caballerias. The second, or eastern, line is called by the surveyor, *"La Linea de las lagunas,"* and the first or southern line, *"La linea frontera del Rio Grande."* There can be no doubt that he regarded the second line as a sufficient approximation to the tortuous coast line, especially as it appears that the low lands along the laguna and aroyo were then inundated. And throughout, the tract surveyed is called a "potrero," which term all the witnesses understand to mean a "natural enclosure suitable to keep stock in."

4. The final grant. A variety of proceedings lead to this. The land is sold at public auction, bought by Salvador de la Garza, who accepts "the said potrero," and his attorney applies to the Judge of Lands and Waters, at Mexico, for a reduction in the price from twenty dollars per league to two dollars for the land in this "potrero." Upon this, the Attorney of the Treasury (Fiscal) reported that the lands of the potrero denounced were found, by the survey, to contain fifty-nine leagues and eleven and a half caballerias; and that, as Salvador de la Garza had been the first to denounce and settle it, he ought to be preferred to others who had

attempted to obtain a part of it ; that the price should
be reduced, and that the fifty-nine leagues, etc., *of the*
*potrero del Espiritu Santo* should be granted to Sal-
vador.   The judge thereupon reduced the price to eight
dollars, and granted the land, subject to the confirma-
tion of the Audiencia.   The advising officer, to whom
the matter was again referred, raised the price to ten
dollars, and recommended the sale to Salvador of "the
lands of the potrero del Espiritu Santo."   The Audi-
encia confirmed the denunciation of "the potrero named
Espiritu Santo, in which are comprised fifty-nine sitios
of ganado major and eleven caballerias of land."   And
the special judge issued a formal grant, or title, for
said fifty-nine leagues, etc., not exceeding its "linde-
ros."   And the grant is entitled "Titles of lands in the
potrero, named that of Espiritu Santo, on the margin
of the lagunas of the sea of the Gulf of Mexico."

The intention of both contracting parties in this grant
is evidently to set apart to the private claimant a well
known tract of land, comprised within natural bounda-
ries, for the purpose of keeping stock within them ; and
the eastern boundary is the lagunas communicating with
the Gulf of Mexico.   It cannot be supposed that the
grantee, when seeking a safe place for his stock, and in-
sisting on his exclusive right to the whole of it, would
have suffered his eastern boundary to be an imaginary
line, with a vacant space of ten square leagues or more
between it and the coast, especially when this land
could have been bought for two to ten dollars per
league.   Nor can it be imagined that the government
would then desire to reserve the worst portion of the
tract, intersected with arms of the sea, and usually cov-
ered with water.   The rule in the construction of
boundary is, that when the call by course and distance
runs along, up, or down, a water-course, the meanders

of the water-course are meant to be designated as a natural boundary. (Newsom v. Pryor, 7 Wheat., 7; Brown *et al.* v. Huger, 21 How., 318 ; Bruce v. Taylor, 2 J. J. Marsh, 160; Trustees v. Wagnon, 1 A. K. Marsh, 243 ; Steel v. Taylor, 3 A. K. Marsh, 326 ; Cockrell v. McQueen, 4 Mon., 63; Sandifer v. Forster, 1 Haywood, 273 ; Hartsfield v. Westbrook, 1 Haywood, 258 ; Harramond v. McGlaughon, 1 Taylor, 136; Shelton & Heatherly v. Maupin, 16 Missouri, 124 ; and Burleson v. Urquhart, 16 Texas, 74; Anderson v. Stamps, 19 Texas, 460.)   And this was a principle in the Mexican practice :  "If the grant of land is made on the shore of the sea, river, or large lake (laguna), such shore must be a side of said land, and the survey must begin and end on it."  (Ordenanzas de T. y A., 5 Ed., p. 94.) The ancient surveys contained no meanders, but only straight lines run to the cardinal points.  The meanders were intended, whenever the survey fronted on a watercourse.  And the object of these early surveys was not to delineate boundaries, but to fix a basis for the estimate of the quantity of land to be bought and paid for. So that from this loose mode of calculation, the quantity of land contained within the natural boundaries often far exceeded the estimate of the surveyor.  But this circumstance could not restrict the limits of the grant or change the boundaries. (Fulwood v. Graham *et als.*, 1 Rich. S. C. Law R., 491 ; and see White v. Burnley, 20 How., 247.)  In fact, marshy, sterile and unproductive land was often designedly omitted in the estimates of the Spanish officer, although included within the boundaries.  (Ordenanzas de Tierras, p. 186; White v. Burnley, 20 How., 247.)

The fact that the eastern line was run by the surveyor, straight, and so as to leave land to the eastward, was much relied on by the plaintiffs ; but it will be

noticed that as this line, according to the practice, had
to be run magnetic north, it was placed as far to the
eastward as was possible, to permit the northerly direc-
tion to be maintained. Had the surveyor gone further
down the Rio Grande for a beginning point of that line,
he would have got into the peninsula at the mouth of
the river, and could not have run north towards the
mouth of the arroyo. Another circumstance on which
the plaintiffs insist, is that a *mojonera* is placed at the
termination of the first or southern line, near the
Tanque, and that that expression denotes a boundary ;
but a landmark, *senal*, was also placed at the end of
the second line on the laguna, and a *mojonera* was
placed at the termination of the actual survey on the
third line, although the distance had not been com-
pleted, and *mojoneras* are often placed on a line short
of the termination of the boundary. In fact, it is ap-
parent that they are intended to designate simply the
trial lines of the survey, so that in case of dispute it
may be repeated and verified. Another circumstance
insisted on by the plaintiffs is, that special mention is
made in the survey of the separate calculation of the
quantity of land between the first line and the Rio
Grande, while no mention is made of a similar estimate
of the land between the second line and the Laguna ;
but this argument would also exclude the land between
the unfinished third line and the Arroyo Colorado, while
it is conceded that the grant actually included that land.
In fact, it is clear that the surveyor regarded the land
to the eastward of the second line as of so little value
as to make it unnecessary to calculate it, and assumed
the second line as "la linea de las lagunas," *i. e.*, as
equivalent, so far as the value went, to the actual coast
line. But while, as between the grantee and the officers
of the government, the estimate of this strip of land

was unnecessary, as it would not have materially affected the value, still as regards the personal intentions and wants of the grantee, it was of the utmost importance; and it is impossible to believe that Salvador de la Garza would have silently acquiesced in a boundary line which would have exposed him to subsequent intruders, and deprived him of the benefit of the natural enclosure, which he had striven so long to secure.

Another point on which the plaintiffs rely, is the expression used, in several places in the final grant *"bajo los linderos, que espresan las medidas," "no propasandose los linderos."* And they contend that the term *"linderos"* here used, refers to the lines run by the surveyor. But it is clear by the context of the grant, and by all the testimony, that this term, as used in titles of this character, means, not imaginary lines, but "visible landmarks or boundaries," such as rivers, lakes, mountains, woods, etc. And in this sense it can only refer here to the Rio Grande, Laguna Madre, Arroyo Colorado, and the thicket on the west.

On all these points the testimony of the experts, Blucher, O'Docharty and Guerra, is very instructive.

V. The plaintiffs, however, contend that even if the Espiritu Santo grant ought to be construed (were it an open question) to include the land in controversy, still this point has been decided by the action of the government of the State of Tamaulipas in the grant to Ignacio Trevino. The fallacy of this position will appear from the following considerations:

1. The proceedings in 1827, 1828 and 1829, in relation to the adjudication of the lands to Trevino, could not bind the defendant, because no citation was served on her or Francisca Cavazos. (Col. Law Tamaulipas, Art. 22.) It is urged by the plaintiffs that Manuel Prieto was the adjoining proprietor, and was the only

party to be cited; but the fallacy of this position is shown by the very proceedings on which they rely; because throughout those proceedings the land adjoining is spoken of as the estate of Salvador de la Garza, still undivided, and Juan Tijerina is cited to represent Xaviera de la Garza, who resided further away from San Martin than Francisca or Josefa Cavazos. The plaintiffs themselves show that Xaviera was settled on the extreme western portion of the Espiritu Santo; and yet she is recognized as a *colindante*. Tijerina himself asserts that he has not consulted his coheirs, and protests against their being concluded. And at the termination of the proceedings he repeats this protest, and denies that he has been properly cited. How then can Francisca or Josefa Cavazos be affected, when no attempt even was made to notify them?

2. Those proceedings were not judicial, and did not follow the usual course of judicial examination; but were of a summary, executive character. (Col. Law Tamaulipas, Art. 9; Constitution of Tamaulipas, Arts. 9, 13, 163–166.)

3. When the limits of official power are known and defined by law, there is no presumption in favor of its legality, when it transcends the limits prescribed, even in case of a foreign government. (United States v. Cambuston, 20 How.)

VI. But conceding that the Espiritu Santo grant included the land in controversy, the plaintiffs contend that the right of the defendant has been barred by prescription and limitation. Let us examine this pretense.

By the will of Blas Maria de la Garza, the defendant acquired, in 1802, one-fifth of the undivided third of the land, which then belonged to him; by the will of Francisca Cavazos and the partition between Ignacio

10—XXXV

Cavazos and the defendant, in 1835, the latter acquired the remaining four-fifths of that third.   So that, at the time of interposing the pleas in reconvention, the defendant was entitled to one undivided third of all such part of the Espiritu Santo grant as had not been sold or distributed among the heirs.   The tract in controversy lay outside of that part of the grant which had been sold or distributed, and was held by the heirs of Salvador de la Garza, in undivided interests, of which the defendant had one-third.

The defendant thus held one-fifth of one-third from 1802, and four fifths of one-third from 1835.   The plaintiff's ancestor first claimed a right or adverse title to the land in 1827.   Before that time he acknowledges, on the first and second pages, and throughout the proceedings which led to the grant to him, that he was a mere occupant under the government, or a squatter. His antecedent possession, therefore, could give him no claim to the land.   (Burgess v. Gray *et al.*, 16 How., 48, 65 ; Pepper *et al.* v. Dunlap, 9 Rob., 283.)

The prescription, therefore, began to run in 1827, at which time the defendant was married, and so remained down to the commencement of the suit.   The property, it is true, was not dotal but paraphernal ; and there is some difference between Spanish jurisconsults, whether a married woman is exempted from prescription as to her paraphernal property.   But the reasoning of the most respectable writings is strongly in favor of the affirmative.   Castillo, Opp. omn., L. IV., Ch. 26, Nos. 18–24, and authors cited.)   But all agree that in such a case the longest period of prescription, thirty years, will alone bar.   (Part III, Title 29, Ch. 8, Note 6, of Greg. Lopez ; Castillo, *ubi sup.*, No. 24, and authors.) This period of thirty years had not elapsed since 1827, by any mode of calculation.

2. As to the four-fifths derived from Francisca Cavazos. True, prescription began to run in 1827 against Francisca, who was not then married, and continued to run against the defendant claiming under her, down to 1841, when the new act of limitation took effect (if, indeed, it did take effect as to the *locus in quo*); but in order to sustain the plea of prescription, it was incumbent on the plaintiffs to show a just title, good faith, and a possession of ten years; or, in want of a just title or good faith, to show a possession of thirty years.

Now, in this case, there was not a *just title*, because it was void on its face, for the defects mentioned. (Bourne *et al.* v. Power, 3 Mart. N. S., 458; Escriche Dicc., Art. Prescripcion de Domino; Marsh v. Weir, 21 Texas, 110.) And when it is offered, it rebuts the usual presumption arising from the longest possession. (Castillo VI, Ch. 26, No. 34; Notes of Faria to Covarruvias, p. 22, No. 148, and authors cited.)

And it is evident that good faith could not exist, when Trevino is shown to have known of the elder title, and to have once been acting for its owners.

3. A possession of thirty years was, therefore, necessary, but this had not elapsed since 1827.

4. Nor could there be any legal presumption of a grant; for, first, the land was already granted to another; second, Trevino acknowledged in 1827 and 1828 that he had no title; third, he produced a void title, under which he claimed.

5. But a complete reply to all pretensions as to limitation is, that it is shown that the defendant, and those under whom she claimed, had been in possession of the Espiritu Santo Grant, claiming an undivided interest in all unsold or undistributed lands, for over sixty years, and during the whole period of the plaintiffs' possession of a part. (Jones v. Menard, 1 Texas, 771.)

VII. The plaintiffs must recover upon their own title, and there is a fatal defect in it—a want of connection between them and Ignacio Trevino. The latter died, a Mexican citizen, at his house at Camargo, in 1842, leaving children, Mexicans by birth and by election. They could not inherit lands in the Republic of Texas. (McKinney v. Saviego, 18 How.; Blythe v. Easterling, 20 Texas, 565.)

Nor is the case of Trevino v. Fernandez, 13 Texas, opposed to this conclusion, because the right of escheat is a sovereign prerogative—a *public* right, and cannot be defeated by a hostile occupation of the territory. (Forster v. Neilson, 2 Pet. 254; Garcia v. Lee, 12 Pet., 511.)

Nor does the legislative grant of 1852 cure this defect. That grant was to Ignacio Trevino, *his heirs* or assigns, meaning in law only *those* children who were capable of being *heirs*. (Horsnby v. Bacon, 20 Texas, 556.)

VIII. The plaintiffs could not recover in this form of action, when it was clearly shown that they were in possession of the lands sued for, and that the defendant had not actual possession of that tract. The plaintiffs should have stated these facts in their petition, and framed it in the nature of a bill of peace or *quia timet*. Not having done so, the proof does not sustain the allegations. (Hart. Dig., Arts. 3320, 3321.)

*R. Hughes*, *Wm. Alexander*, and *Powers & Maxan*, for the appellees.—1. Was the grant made in violation of the colonization law of the eighteenth of August, 1824? Clearly not. It is true that the land embraced in it is within littoral leagues, but it was a grant to a native Mexican, and the prohibition only applies to foreign colonists.

This question has been settled and determined by the Supreme Court of the United States upon principles which cannot, in our judgment, be questioned. In the examination of the question, that court say: "But while a judicious policy might forbid the settlement of large bodies of foreigners on the boundaries and sea-coast, we cannot impute to them the weakness or folly of confining their native citizens to the interior, and thus leaving their seacoast a wilderness without population. On the contrary, the same considerations of policy which excludes foreigners, would encourage the settlement of natives within those bounds. The statute books of Mexico abound in acts offering every induce-ment to Mexican families to settle on the frontier; prof-fering gratuitous grants of land and agricultural imple-ments, expenses of their voyage, maintenance for a year, and leave to import certain articles free of duty. The military posts in the territory were on the sea-coast; and it would be a strange policy indeed which would isolate the posts intended for the protection of the settlers, and compel them to dwell among the sav-ages without protection." (Arguello v. The United States, 18 How., 548.)

Again, say the same court: "The regulations of 1828, made for the purpose of carrying into execution the law of 1824, evidently gives this construction to the act. It makes a clear distinction between empresario contracts for colonization, and grants to Mexican citi-zens. In conformity to the fourth article of that act, it requires grants to empresarios to have the sanction of the Supreme Government; while those made to individ-uals or families need only the approval of the Territo-rial Deputation. This may be said to be a legislative construction of the act of 1824, and demonstrates that this restraint of grants within the littoral leagues had

no application except to colonies of foreigners." (Ibid, 549.)

The interpretation spoken of being by the only tribunal (the Mexican Congress) which had power authoritatively to ascertain such interpretation, it follows that such was the intention of the Mexican Congress in making decree number seventy-two, the general colonization law of 1824.

And such is the interpretation placed upon it by the Congress of the State of Tamaulipas by the colonization law of that State of the fifteenth of December, 1826. In that law we find this provision:

" ART. 11. In the same manner he (the Executive) shall take care that no town projected by foreigners be situated within ten leagues upon the coast of the Gulf of Mexico, within the limits of the State, without previously obtaining the consent and approbation of the Supreme Executive of the Union." (Laws and Decrees, 345.)

And this is all there is in this or any other law of the State of Tamaulipas, within our reach, or of which we have heard ; and this is made in exact conformity to the intention of the general law as shown by the opinion of the Supreme Court of the United States.

There is therefore no prohibition to the giving the title of adjudication and ownership of lands even to foreigners. Within the limits of the littoral leagues, the prohibition only applies to the formation of towns, or, as it should be more properly translated, settlements, within the littoral leagues ; the acquisition of land by foreigners, otherwise than as empresarios, being left to stand upon the same footing as to natives ; provided they are first domiciliated within the State. (Ib., Arts. 1, 2, 3, 4, 5, 6, 7, 8.)

In the last clause of the first sentence of article two,

speaking of the manner in which foreigners may acquire lands by adjudication, it is said, "or he may establish a new town, with one hundred families at least;" and by these means, as well as in that provided in the previous part of the section, the title of adjudication and property, as spoken of in article eight, may be obtained; because in the same law it is subsequently provided that "this law grants to the contractor or contractors of new towns [settlements] for every hundred families which they introduce and establish in the State, five sitios of grazing land and five labors." (Ib., 346.)

Instead of grants to natives being prohibited, or contemplated to be prohibited, the whole tenor of the law is directly to the reverse; for the court will see, by an examination of the law in all its provisions, that all the lands throughout the limits of the State are placed upon the same footing, with the single exception of the case where a foreigner applies for a contract for a colony, when the consent of the National Executive is necessary.

But it seems to be seriously contended that the Supreme Court of the State of Texas, having, in the cases of Good v. McQueen, Edwards v. Davis, Thorn v. The Republic, Smith v. Power, and other cases, determined that all grants made within the border and coast leagues, without the approbation or consent of the National Executive, are void; consequently, this grant, being within the coast leagues, and made without the approbation or consent of the National Executive, is void. This may be the rule in the cases referred to, in relation to land, within what was legitimately within the States of Coahuila and Texas; but it can have no application to grants such as that to Ignacio Trevino, which granted the land in question, which, when the grant was made,

was, indisputably, within the limits of the State of Tamaulipas.

The grant was issued in March, 1829, and no one pretends that at that time the country in which the land is situated was within the limits of Coahuila and Texas. We all know that it was within the legitimate limits of Tamaulipas, which then, like Coahuila and Texas, was one of the States of the Mexican federation. It was only by the act of .the Congress of the Republic of Texas of the nineteenth of December, 1836, that a claim was for the first time set up to the territory extending to the Rio Grande. (Oldham & White's Digest, Art. 111.) But this was only a claim set up, unperfected by possession—ratified, however, by the subsequent treaty between the United States and Mexico. The possession, however, of the country between the Nueces and Rio Grande was never obtained by Texas until occupied by the United States army in 1846, when obtained by conquest.

These statements, it would seem, furnish no basis upon which or from which a deduction can be made that the grant is void, within the rule of the cases referred to. It would rather seem that the conclusion should be, that the grant having been made in conformity to the laws of the State where the land was situated, at the date of the grant, was good and valid ; though it might afterwards turn out, by a revolution brought about by war and conquest, the country including the land granted was annexed to and became part of a State whose judicial authorities subsequently declared that certain grants, issued in violation of the laws of that State as it was before the war and conquest, were illegal and void. Were there no other reason, the colonization law of 1826, in all its parts, is a specific authority for the issuance of the grant to a

Mexican within the littoral leagues, and, if in conflict with the fourth article of the general colonization law, not having been so declared before the change of government, remains good. (Smith v. Power.) Some such view appears to have been in the minds of the Legislature of Texas at the time of the passage of the act entitled "An act to provide for the investigation of land titles in certain counties therein mentioned" (Hartley's Digest, Art. 2271 *et seq.*), for by the ninth section of that act it is provided "that the said board shall make an abstract of every claim so filed, and the evidence adduced in support of or against it, and shall accompany the same with a statement of their opinion of its genuineness and validity, and whether the same ought to be confirmed or rejected, having a due regard to the principles of justice, and to the laws, ordinances, rules and customs of the government and authorized political authorities under which the claim originated. (Ib., Art. 2276.) And this investigation was to be in relation to "all titles and claims to land which emanated from the governments having and exercising jurisdiction over the country prior to the second day of March, 1836." (Ib., Art. 2272.)

Why make such provisions unless the Legislature felt itself under obligations to respect such titles, because of their having issued by a government rightfully claiming sovereignty over the country where situated. But, by the section quoted that there should be a favorable report on claims presented to the commissioners, the claim was to be genuine and legal in conformity to the laws, ordinances, rules and customs of the government, and authorized political authorities under which the claim originated. The claim under consideration was presented to the commissioners, was acted upon by them, and was by reason of their action confirmed (see

act of 1852) ; it must be, therefore, that it was genuine and legal and in conformity to the laws, etc., of the government under whose authority it issued.

But again, the case of Goode v. McQueen, and the other cases cited, were determined upon the interpretation given by the Congress of Coahuila and Texas to the general colonization law, as contained in the colonization law of 1825 and 1832, and on the sale law of 1834, and upon the instructions to commissioners in 1827, which have no analogy whatever, as interpreted by the court, to the laws of colonization of Tamaulipas. We presume it will be difficult to convince this court that the actings and doings of Tamaulipas, within the littoral leagues, in relation to the grants of lands to their own citizens, were manifest usurpations of authority ; and that, until so convinced, this court will suppose that the Mexican and Tamaulipas authorities had as just views of their power and authority, and the true interpretation of their laws, as this or any other court can have, and that this court will consequently yield their assent to the correctness of their acts in question. (Hancockv. McKinney, 7 Texas.)

2. Is it true that a grant or title of possession, perfected by the proper authorities, could not be for more than one hundred and twenty-five million square varas? We will show, as we believe, that such is not the fact.

But before proceeding with the investigation, it may be necessary to ascertain the meaning of a term found in the colonization law of Tamaulipas; the term is "adjudication," and is found in Articles 2, 8, 20, 22, 25 and 31 of said law. (Law, Decrees 344, 345, 346, 347 and 348.)

In the second, twenty-fifth and thirty-first articles, the word is used by itself; but in the other articles quoted, it is found in connection in the eighth with

ownership, "the title of adjudication and ownership;" in the twentieth it is "adjudication and possession;" so in the twenty-second. These expressions, however, do not convey of themselves to the mind a definite and determinate idea of their proper use. This is only to be obtained from the practice on the subject, and this is as well shown by the two grants or titles of possession, which are in contest in this suit, as it can be by other means. An application is made for land to the proper officer; an examination and survey of the land asked for is made, the adjoining proprietors being cited, for the purpose of ascertaining its situation, quality, value and quantity, and to fix its locality and boundary. Of this examination and survey a report is made; and the amount of money to be paid being ascertained by auction or otherwise, and paid, the adjudication is made which determines the right of the party, being the assent of the government to the proposition to buy, and that forms the title, which, being connected with the delivery of the possession, gives the right of property or dominion. This we take to be the use of the term in the law referred to.

That which has produced the objection taken to the San Martin title, is the latter part of article twenty-five of the law of Tamaulipas, in these words:

"The Executive shall convoke those born in the Republic for the occupation of vacant lands, who shall be preferred to foreigners in the order of the older date of the designations (*denuncios*); and in case of equality, the natives or inhabitants of the place to which the land designated belongs shall have the first place; those of places in the State, the second; and those of the other States of the Republic, the third; and adjudication may be made up to the amount of one hundred and twenty-five millions square varas." (Ib. 348.)

Now, suppose all other questions were waived, and it were admitted that taking this by itself, an adjudication for more than five leagues, or one hundred and twenty-five millions square varas, would be void; yet the grant or title of possession in question is not void, for the reason that by a subsequent provision of the same law the difficulty is obviated. Article thirty-one is in these words: "Lands acquired by virtue of this law cannot pass into mortmain; more than two grants cannot be adjudicated to one individual, and that when the increased number of those he removes demands it of necessity." (Ib. 348.)

The limitation in article twenty-five is a limitation of the amount of adjudication, and, taken in connection with the thirty-first, shows that it was intended to be the limit which was to be adjudicated to one individual. But to this limitation of the amount to one individual there is the exception of the case which is produced by the necessities of the person applying for land, in which case the amount may be increased to double that provided for in the twenty-fifth article, or in other words, two grants (*mercedes*) may be adjudicated. There is to be a neccessity for this increase. Who is to be the judge of the necessity? Of course the officer appointed for that purpose by the law; and when it is determined, there is an end of it, and the party applying is entitled. (Jenkins v. Chambers, 9 Texas, 328, 329, 330.)

We cannot, with both of these articles before us, see the grounds upon which it is supposed that the grant for ten leagues is illegal, unless it be upon the ground, which has been insisted upon, to render augmentations under the seventeenth article of the Colonization Law of Coahuila and Texas of 1825 invalid, that, in order that there might be an augmentation, it was necessary that there should be a grant to a colonist or settler, and

then an augmentation by the Executive upon a petition showing the necessity for such augmentation. But the court, in Jenkins v. Chambers, sanctioned a grant which was for the amount contemplated by the fourteenth, fifteenth and sixteenth articles, with the augmentation at the same time. (Ib., p. 228.)

It would be a strictness indeed were it to be determined that, under the twenty-fifth article of the Colonization Law of Tamaulipas, there was first to be an adjudication of five leagues, and then, upon being satisfied that the party came within the rule of the thirty-first article, to make an adjudication for five leagues more ; and any such determination would be in conflict with the well settled practice of the government, as ascertained by the grant to Ignacio Trevino, and other grants confirmed by the act of 1852, upon the report of the commissioners, and would violate the rule this court has prescribed for its government, that they will respect the acts of the former authorities, as they must have known more about their laws than we do. (Holloman v. Peebles, 1 Texas ; Hancock v. McKinney, 7 Texas.)

These questions all being settled, as we believe, it results that the documents A. and B. and C. together make the title of possession and grant which gave the right to the grantee, Ignacio Trevino, in and to the land embraced in its boundaries ; and of course those claiming under him were entitled to recover, as they did recover, in the court below.

WALKER, J.—This is an action of trespass to try title, brought in the District Court of Cameron county, on the eighth day of April, 1852, by Manuel Trevino, as administrator of the estate of Ignacio Trevino, against James Penn, Rafael Garcia Cavazos and Maria

Josefa Cavazos, his wife, and others, citizens of the Republic of Mexico. By an amended petition, the heirs of Ignacio Trevino became plaintiffs, and Maria Josefa Cavazos was left sole defendant in the suit. The amended petition was filed on the twelfth of December, 1853. The defendant plead the general issue, and, in reconvention, that she was "seized and possessed, in her own demesne as of fee, of one undivided third part of the whole of the tract of land in the said plaintiffs' petition described as being a part of a larger tract known as 'El Potrero del Espiritu Santo.'" The venue was changed to Nueces county. The defendant again plead in reconvention. The plaintiffs set up title by prescription, and excepted to the pleas in reconvention. The plaintiffs had also pleaded the statutes of limitation. To this, the defendant replied her coverture for thirty years previous to the commencement of this suit.

Upon the trial the plaintiffs offered in evidence a copy of a testimonio of title, issued by the alcalde of Matamoras in 1829, to Ignacio Trevino, which was proved to be a genuine copy of the original, and which had been recorded in Cameron county. This was objected to by the defendant; first, because the proof only showed it to be a copy of the *testimonio*, and not of the *protocol* of the title, and also that the original was not accounted for; second, that it was not such an instrument as the law authorizes to be recorded, and that the proof of it was not taken before a proper officer—the notary, B. F. Fry, having accepted the office of county clerk of Cameron county prior to the time of taking the depositions of the witness.

The plaintiffs also offered in evidence, to prove title, a copy of a grant from the government of Tamaulipas, issued in 1829 to Ignacio Trevino, based upon the title

of possession, and also a survey of the grant ; by both of which it appeared that the grant was within the littoral leagues. They were objected to for this reason, and because plaintiffs had not shown that the consent of the general government of Mexico had been obtained for the grant ; and for the further reason, that the colonization laws of Tamaulipas limit grants to five leagues, and this grant exceeded the limit.

These objections were overruled and the defendant excepted. On the part of the defense, there was given in evidence a testimonio of title, issued in 1781, to Jose Salvador de la Garza, by the Viceroy of Mexico, for the lands of the Espiritu Santo.

It is in proof that Garza, the grantee, had three children—Blas Maria de la Garza, who married Francisca Cavazos ; Xaviera de la Garza, who married Jose de Goseascochea ; and Margarita de la Garza, who married Lopez Prieto. By the wills of some of the heirs, and the subsequent disposition of their property, Mrs. Cavazos, the defendant in the court below, claims to have become the owner of the undivided one-third of this grant.

The main subject matter here in controversy appears to have been adjudicated in the Federal courts, and was decided by the Supreme Court of the United States, at the December Term for the year 1867.

Mr. Justice Swayne in his opinion remarks, that the question in controversy was the true eastern boundary of the Espiritu Santo tract ; and that it was a question of fact, to be determined by the jury upon the evidence before them. (See Cavazos v. Trevino, 6 Wallace, 780.)

We have examined this case carefully, and we need no clearer light in which to place the case before us, than that which is afforded by the learned opinion of this highest judicial tribunal known to our government.

There are some questions raised in the record before us, which it may not be amiss briefly to notice. The document marked "A" was offered in evidence by the plaintiff below as a muniment of title to Ignacio Trevino, the ancestor of plaintiffs. It was supported by the deposition of Domingo de la Garza, taken before Budd H. Fry, who was supposed to be a notary public of Cameron county ; who, having accepted the office of clerk of the County Court, it is claimed had vacated the office of notary public. (See Biencourt *et al* v. F. J. Parker, 27 Texas, 558.)

This deposition was objected to, the objection overruled, and an exception taken. The question does not appear to us of material importance in the case. Document "A" was offered in evidence as a recorded instrument, and, we think, under the laws of Texas, was properly recorded, whether its record be referred to the act of 1836, or the subsequent act of May 12, 1846. It has been supposed that the act of 1846 repealed, by implication, the act of 1836. Whether this be so or not, the document was " an instrument of writing of and concerning lands and tenements." It was, indeed, the testimonio of the title of possession.

The document B. C., executed by the evidence of Stephen Powers, was the final title issued by Fernandez, the Governor of the State of Tamaulipas, to Ignacio Trevino for the San Martin land.

To documents A. and B. C., the defendant below objected, on the grounds that the lands mentioned and described within them were within the littoral leagues of the coast of the Gulf of Mexico, and granted without the approbation or consent of the National Executive, and in violation of the fourth article of the colonization act of 1824 ; that the documents show that more than one hundred and twenty-five millions of square varas

were covered by the grant in the potrero of San Martin to Ignacio Trevino, and that the grant violated the colonization law of the State of Tamaulipas.

These objections were overruled, and the documents A. and B. C. were read in evidence.

The prohibition contained in the act of August 18, 1824, has been held by the Supreme Court of the United States, in Arguello v. United States, 18 Howard, 548, 549, not to have applied to citizens of Mexico, but only to foreign colonists. In this case it is shown that there was a marked difference between the empresario contracts and grants to Mexican citizens. In conformity with the fourth article of the act of 1824, the empresario contracts required the sanction of the supreme government, while those grants made to families and individuals, Mexican citizens, were made valid by the approval of the territorial deputation. The Mexican Congress clearly defined this to be the law in 1824, by decree No. 72. By the act of the fifteenth of December, 1826, passed by the Congress of the State of Tamaulipas, it was declared that the Executive should take care that no town projected by foreigners be situated within ten littoral leagues of the coast of the Gulf of Mexico, without the consent and approbation of the supreme executive being first obtained.

The objection, then, to the reading of these documents was properly overruled.

The great learning and ability displayed by counsel on both sides of this case has rendered its examination pleasant and agreeable; but we do not find it necessary to follow them, in this opinion, through the discussion so ably conducted.

We will proceed to state the points decided in the case as reported in 6th Wallace: "Where an early Spanish petition asked and obtained a grant of land by

11—xxxv

general boundaries, which were capable of an interpretation in two senses, one broader than the other, the terms of boundary open to question as to meaning were held to be rightly interpreted by the jury, from a survey carefully made on the ground by lines and monuments, and specifying the quantity within the lines (the grant referring to the survey and specifying the quantity granted), and by practical interpretation, from occupancy and otherwise, by the parties interested in the matter.

"In settling, in such a case, what has been granted, the quantity of land specified, as well as the boundaries named, and the survey as made, all are to be considered ; and by their united light the proper conclusion is to be reached.

"The practical interpretation which parties interested have by their conduct given to a written instrument, in cases of an ancient grant of a large body of land, asked for and granted by general description, is always admitted as among the very best tests of the intention of the instrument.

"In construing such a grant, the circumstances attendant, at the time it was made, are competent evidence for the purpose of placing the court in the same situation, and giving it the same advantages for construing the papers, which were possessed by the actors themselves.

"A document duly certified, 'in the absence of a notary public, according to law,' in the presence of a witness, by the alcalde of the jurisdiction, to be a true copy, made and compared by witnesses named, of the original record of proceedings had in the adjudication of lands granted by the government to persons named (in which proceedings it became necessary to ascertain a particular boundary line), was held to have been

properly received in evidence in this case, under certain statutes of Texas, on a question relating to that boundary ; the alcalde's official character and signature, and that of the attending witnesses, being proved, and that they were dead."

We have been greatly assisted, in a proper understanding of these grants, by the map accompanying the brief of Messrs. Powers & Maxan, the attorneys of appellees, and that which accompanies the case as reported in 6th Wallace.

It will be seen from the maps submitted for our inspection, that the western boundary of the Mexican grant is a line running due north from a point near the Tanque, and this is one of the calls of the Espiritu Santo grant. From this point the two lines will be seen to diverge—the western boundary of the San Martin and other tracts appears to run due north, allowing some ten degrees for variation east, while it is believed that the Spanish surveys of the period of the Espiritu Santo were run by magnetic courses, and the second course of the Espiritu Santo survey was run magnetically north, and this will account for the divergence of the lines from the corner near the Tanque, and the large gore of land lying between them.

The western boundary line, as claimed by the plaintiffs, was run upon deliberation and information derived from the government, and was marked at different points by fixed monuments. The plaintiffs proved their continuous possession up to this line. The proposition made by the attorneys for appellees, to relinquish their claim, if so required (in order to affirm the judgment of the court below), to the large gore of land lying between the two lines running north, does not meet the approbation of the court. We would put no construction upon the law or the evidence to

extend the grant made by the Viceroy of Mexico, in 1781, to Jose Salvador de la Garza, beyond that which we believe to be the true eastern boundary of the Espiritu Santo grant. The grant of fifty-nine and a half leagues of land to one individual, though made at a time when of little value compared to its present worth, was princely in its character, and he who would ask for more, by implication or construction, should be held to make a very clear case of right before his prayer can be heard.

The grant of 1781 was made upon a survey conducted, apparently, with great accuracy; the surveyor himself gives us such a journalistic and historical account of his survey, day by day, defining his monuments and witnessing them by natural objects, as utterly to preclude the idea of any uncertainty about the line. It does appear, from the evidence, impossible to suppose that the Espiritu Santo grant could ever have been intended to cover the San Martin, Santa Isabel and Buena Vista grants. If this had been intended, the corner located at the Tanque, from which the northern lines take their departure, must have been located at the mouth of the Rio Grande, and the lines, which run due north and magnetically north, would have followed the coast of the Gulf of Mexico, and the Laguna de la Madre, in a northerly course, bearing west.

We believe the land included in the gore to belong to the San Martin, Santa Isabel, and Buena Vista grants; and we are further led to consider that the owners of those grants require no better title than that derived from the political authority of the State of Texas. (Article 4461, Paschal's Digest.)

The objections set up by the appellant to the proceedings of the political and judicial authorities of the State of Tamaulipas are not well taken.

The colonization law of the State of Tamaulipas did not, in all cases, confine the grant of lands within the limit of five leagues, but it was competent for the Executive, on a proper showing of the necessities of the individual, to nearly double the ordinary grant of five leagues; and of the existence of such necessities, the Executive was the proper judge, and it certainly does not lie in this court to impeach his action in the premises. (See Jenkins v. Chambers, 9 Texas, 228, 230; Polk's lessee v. Wendall, 3 Cond. Rep. 291.)

This court has repeatedly announced the doctrine that they will defer to the political and judicial authorities of other governments, in the administration and interpretation of their own laws. (See Holloman v. Peebles, 1 Texas, 673; Hancock v. McKinney, 7 Texas, 384; Edwards v. James, 7 Texas, 382.) These authorities apply to the objection that the lands claimed by appellees were within the ten littoral leagues. The grants appear to have been originally made to Mexican citizens, and it appears to have been entirely within the province of the supreme executive to have permitted such grants to be made.

It is fairly to be presumed from the long continued possession of the appellees, under both the Spanish and Mexican governments, disturbed by no action of the political authority, and questioned by no adverse claimant until so late a day, that their grant was in all respects regular and legal.

We are, then, of the opinion that the appellees have established their title to the lands claimed by them up to the western boundary as fixed in 1828 by the authorities of the State of Tamaulipas; and, coinciding with the views of the Supreme Court of the United States in the case of Cavazos v. Trevino, we affirm the judgment of the District Court.

AFFIRMED.